**Andrejs V. STRAUSS, M.D.,
et al., Plaintiffs**

v.

**PENINSULA REGIONAL MEDICAL
CENTER, et al., Defendants**

Civil A. No. AMD95–1949.

United States District Court,
D. Maryland.

Feb. 29, 1996.

Jack C. Tranter, Peter E. Keith, Thomas C. Dame and Gallagher, Evelius & Jones, Baltimore, Md., for plaintiffs.

Roger D. Redden, Michael F. Brockmeyer, Kurt J. Fisher and Piper & Marbury, L.L.P., Baltimore, Md., for defendant Peninsula Regional Medical Center.

Robert B. Kershaw, John A. Bourgeois and Quinn, Ward & Kershaw, Baltimore, Md., for defendants Drake, Blumberg, Brookland and Zinreich, M.D., P.A., and Albert L. Blumberg, M.D.

DAVIS, District Judge.

This action, instituted by two physicians against a hospital which terminated their staff privileges, requires this Court to explore the implications of *Anne Arundel General Hospital, Inc. v. O'Brien*, 49 Md.App. 362, 432 A.2d 483 (1981), which recognized a breach of contract claim under some such circumstances.

## I. INTRODUCTION

Plaintiffs, Andrejs V. Strauss, M.D. ("Strauss"), Vincenzo DeMasi, M.D. ("DeMasi"), and Drs. Strauss, DeMasi & Associates, P.A. (the "Strauss/DeMasi group"), instituted this action against defendants, Peninsula Regional Medical Center ("Peninsula Regional") Drake, Blumberg, Brookland & Zinreich, M.D., P.A. (the "Drake/Blumberg group"), and Albert L. Blumberg, M.D. ("Blumberg"), alleging violations of federal and state antitrust laws, breach of contract, and defamation, as a result of the termination of their medical staff privileges at Peninsula Regional. This Court has federal question jurisdiction over the federal antitrust claim and supplemental jurisdiction over the state claims. 28 U.S.C. §§ 1331, 1367(a). Pending before the Court are cross motions for partial summary judgment on the breach of contract claim.[1] The parties have fully briefed the

---

[1] On July 18, 1995, the Court issued an Order denying plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction under the antitrust laws. That Order is currently pending before the United States Court of Appeals for the Fourth Circuit upon plaintiffs' appeal. This Court retains jurisdiction notwithstanding the interlocutory appeal. *Taylor v. Sterrett*, 640 F.2d 663, 667–668 (5th Cir.1981); *Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 487–488 (E.D.Pa.1995). On November 3, 1995, the Court denied a motion to intervene

issues; no hearing is deemed necessary. *See* Local Rule 105.6 (D.Md.1995).

For the reasons set forth below, the motions for summary judgment shall be denied because the Court is not allowed at this stage to draw inferences supportive of the ultimate facts on which this case turns. As an aid to the parties in future proceedings in this case, the Court will set forth a detailed version of the historical events underlying this dispute, and will endeavor to note those areas where the possibility of conflicting inferences are present. As will become apparent, in the Court's estimation, the outcome of the breach of contract claim turns largely upon the ultimate motivation and intent the fact-finder elects to ascribe to the actions constituting the undisputed historical facts.

## II. SUMMARY JUDGMENT STANDARDS

■ Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

■ A party opposing a properly supported motion for summary judgment "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Har-*

dy, 769 F.2d 213, 214 (4th Cir.1985); *see O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy,* 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn from the facts, must be viewed in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The burden is on the moving party to demonstrate the absence of any dispute of material fact. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *ITCO Corp. v. Michelin Tire Corp., Com. Div.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted); *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991).

■ The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Acc. and Indem. Co.,* 627 F.Supp. 170, 172 (D.Md.1985) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice*

filed on behalf of the Medical Staff of Peninsula Regional, on the ground that the interests of the

Medical Staff were adequately represented in this action.

*and Procedure:* Civil 2d § 2720). *See Federal Sav. and Loan Ins. Corp. v. Heidrick,* 774 F.Supp. 352, 356 (D.Md.1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band, Etc. v. Voigt,* 700 F.2d 341, 349 (7th Cir.), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983).

■ "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil and Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir.1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n. 3 (Fed.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook,* 713 F.2d at 665. In the instant case, a careful review of the voluminous record establishes that, although there is no *genuine* dispute of material historical fact, there is a very substantial dispute as to the inferences (as to institutional intent, motivation and importantly, good faith) which arise from those facts. Thus, viewing the facts (and the inferences based thereon) most favorably to the non-movant as to each motion, each motion must be denied.

## III. FACTS

Peninsula Regional is an acute and tertiary care facility located in Salisbury, Maryland.[2] In 1981, Peninsula Regional established a hospital-based radiation therapy facility equipped with two linear accelerators and a simulator.[3] Peninsula Regional recruited plaintiff Strauss, a board certified radiation oncologist then practicing in Florida, to provide radiation oncology services at the new radiation therapy facility.

Strauss and Peninsula Regional entered into an exclusive contract for radiation oncology services, effective June 1, 1981. Pursuant to the contract, Strauss was appointed Director of Radiation Therapy within the Department of Radiology, and was granted active medical staff privileges, as provided by the Peninsula Regional Medical Staff Bylaws ("Medical Staff Bylaws"). As Director, Strauss exercised supervisory authority over the planning, staffing and daily functions of the radiation oncology program. As a consequence of his exclusive contract with Peninsula Regional, Strauss effectively had the authority to designate physicians who would receive medical staff privileges in radiation oncology.

In 1987, Strauss invited DeMasi, who was then a fellow at the University of Chicago Medical School, to join the radiation oncology medical group at Peninsula Regional. DeMasi was hired, and he also was granted active medical staff privileges pursuant to the Medical Staff Bylaws, and later became Strauss's business partner and a shareholder of the Strauss/DeMasi group, a professional association incorporated under the laws of Maryland. In 1990, the Strauss/DeMasi group hired Catherine North, M.D., a radiation oncologist, who also received active medical staff privileges at Peninsula Regional. At a later date, the group hired Gail C.S. Anderson, M.D.

---

2. Peninsula Regional Medical Center, formerly known as Peninsula General Hospital Center, serves patients in Wicomico, Somerset and Worcester counties. Peninsula Regional is a non-profit corporation organized under the laws of the State of Maryland. Its governing body is the Board of Trustees.

3. Radiation therapy is a widely used form of modern cancer treatment. It makes use of ionizing radiation, deep tissue-penetrating rays which destroy cancer cells.

Strauss's exclusive contract with Peninsula Regional to provide radiation oncology services was continuously renewed until May 31, 1992, when the parties failed to agree on renewal terms. Consequently, the radiation oncology program at Peninsula Regional began to function with an "open" medical staff; it was no longer a "closed" medical staff composed exclusively of members and employees of the Strauss/DeMasi group.[4] As a result of the "open" medical staff policy, North left the Strauss/DeMasi group in early June 1992 and established her own competing radiation oncology practice at Peninsula Regional. North hired Scott Edwards, M.D., as her employee.

Disputes between plaintiffs and North arose over such issues as patient referrals, scheduling of patients on the available equipment and the peer review process. Members of the two competing practice groups also experienced "interpersonal difficulties." Less euphemistically, the relationships were wracked by charges of patient stealing, assault and battery, intimidation and the like. In a letter to Louis Himes, Vice President of Medical Affairs, dated October 19, 1993, North reported that "the atmosphere is extremely charged as there is considerable animosity between the two radiation oncology groups." Akin Aff. Ex. 3. On December 29, 1993, in an effort to resolve the "interactive problems of the [r]adiation [o]ncologists," the Professional Review Committee of the Medical Staff reviewed the entire radiation oncology program and made several recommendations to the Executive Committee of the Medical Staff (the "Medical Staff Executive Committee"). The Professional Review Committee recommended that the radiation oncology program be reorganized into an independent division of the Department of Radiology, and that members of the division elect its leadership.[5] The Professional Review Committee also recommended that

steps be taken to separate the two practice groups physically, since the vitriol between the physicians had also infected their respective office staffs. In April 1994, the Board of Trustees of Peninsula Regional (the "Board") formally created the Division of Radiation Oncology and approved the rules and regulations for the new division. At the first division meeting on April 19, 1994, Strauss was elected Division Chief, and DeMasi was elected Assistant Division Chief, essentially because the Strauss/DeMasi group controlled a majority of the voting members of the division. North refused even to attend the meeting.

On June 20, 1994, plaintiffs informed Dan H. Akin, President and Chief Executive Officer of Peninsula Regional, that they were in the process of building a free-standing, for-profit radiation therapy facility in Berlin, Maryland, approximately twenty-five miles from Peninsula Regional (the "Berlin facility"). This news caused the President and the Board considerable concern. At its regular monthly meeting on July 7, 1994, members of the Board expressed concern over the Berlin facility "competing directly" with Peninsula Regional for patients. The Board was also concerned about the fact that "a significant amount of Medical Center resources in time and dollars [had] been expended" in preparing for a multi-million dollar bond issue, in cooperation with the Maryland Health and Higher Educational Facilities Authority, to finance the expansion of the hospital-based radiation facility. Furthermore, the Board was disturbed by the fact that while plaintiffs were building the Berlin facility, they were also members of the Radiation Oncology Design Team, advising Peninsula Regional on the need to expand the hospital-based radiation facility. The minutes of the July 7 Board meeting reveal that the Board decided to "put on hold" the radiation facility expansion plans, while its Executive Committee

---

**4.** A "closed medical staff" is created under the terms of an exclusive arrangement, under which a hospital enters into a contract with a particular physician group for certain services, and thereby "closes" a practice area to other physicians who are not members or employees of the contracted physician group.

**5.** The Review Committee also recommended to the Medical Staff Executive Committee that:
> The physicians in Radiation Oncology should be advised that we will no [sic] tolerate shouting or arguing in front of patients in the Department and that such activities could bring on disciplinary action.

Akin Aff.Ex. 5

"develop[ed] a plan of action/recommendations." Akin Aff.Ex. 10.

On July 28, 1994, the Board held a special meeting to discuss what action should be taken, if any, in light of the recent disclosure that the plaintiffs were "secretly and deceptively constructing a radiation oncology unit at Berlin while encouraging [Peninsula Regional] ... to expand [its] radiation oncology capability by 50%." Akin Aff.Ex. 11, Minutes of Special Meeting, Board of Trustees, at 2. In executive session, legal counsel presented a "Statement of Facts" regarding Strauss's and DeMasi's activities, and proposed certain Board action. The Board discussed, *inter alia,* (1) the effect that the Berlin facility would have on the expansion of the hospital-based facility, and (2) the manner in which the Board should participate, if at all, in the development of the Berlin facility. At the end of the meeting, the Board adopted a resolution, which provided:

(1) The Board is morally offended and disgusted by the actions taken by Drs. Strauss and DeMasi[;]

(2) The Board finds on the basis of report [sic] there is reasonable cause to believe that the Statement of Facts is true[;]

(3) The Board directs the Chairman of the Board to appoint a special committee of the Board, which consists [sic] of members of the Executive Committee of the Board, plus the President of the Medical Staff, to meet with Drs. Strauss, DeMasi, and Anderson for the purpose of affording Drs. Strauss, DeMasi and Anderson an opportunity to address and respond to such relevant findings of facts as the committee may believe to be true[;]

(4) The Board declares a moratorium on accepting applications of new physicians on Medical Staff in the Division of Radiation Oncology for a period not to exceed one year[;]

(5) The Board directs the Administration to promptly investigate the advisability and feasibility of closing the Division of Radiation Oncology and awarding an exclusive contract to a physician or physicians to provide professional services within the hospital format.

Akin Aff.Ex. 11.

At the same meeting, an unidentified person "emphasized" that the Board would unavoidably have to address the complete issue of whether Peninsula Regional is "willing to compete with the Berlin facility and at the same time subsidize the competing facility by allowing the involved physicians to maintain Medical Staff privileges." *Id.*

The Special Committee of the Board (the "Special Committee"), created by the July 28, 1994, Board resolution, made an effort to meet with members of the Strauss/DeMasi group. Strauss and DeMasi did not meet with the Special Committee in the summer of 1994. However, Anderson, the sole physician-employee of the Strauss/DeMasi group, attended the August 17, 1994, Committee meeting together with her attorney. The details of Anderson's statement to the Special Committee were not recorded in the minutes of the meeting, but the Committee concluded that Anderson was not involved in the plans to open the Berlin facility. The Special Committee then had "extended discussion" on recruiting radiation oncologists and appointing a Medical Director for Radiation Oncology. The Committee formed a subcommittee (the "Search Committee"), composed of three physicians, one Board member, and two administrative personnel, to begin the "active recruitment of an outside radiation oncologist(s)" who has "recognized medical and administrative abilities to take over operation of the radiation oncology unit." Akin Aff.Ex. 12.

The Search Committee met with two radiation oncology groups: (1) the Division of Radiation Oncology of The Johns Hopkins Health System, and (2) the Drake/Blumberg group, which operated the radiation oncology program at Greater Baltimore Medical Center. The two groups examined the radiation oncology services provided at Peninsula Regional and discussed the possibility of an exclusive contract and other compensation alternatives, which included: (1) salary plus incentives; (2) fee-for-service; (3) combination of fee-for-service and a medical directorship contract.

On November 2, 1994, the Special Committee met with plaintiffs. The Special Committee told plaintiffs that Peninsula Regional would only consider buying 100% ownership of the Berlin facility at fair market value, and that there could be no partial ownership. The Committee also told plaintiffs that Peninsula Regional was negotiating an "exclusive" contract with a new management group, with the aim of establishing a single group of physicians in the Division of Radiation Oncology with a new medical director.[6] On the following day, Strauss responded in a letter stating, *inter alia*, that his practice group stood "ready to enter into meaningful discussion and negotiations which would lead to a joint approach to the Berlin facility." However, he continued, "good faith negotiation can only be had if the proposed 'new leadership' mentioned at our prior meeting, which you advised meant the importation by [Peninsula Regional] of physicians from outside of the Eastern Shore into [the] Department [of Radiology], is removed." Akin Aff. Ex. 17. Further negotiations between plaintiffs and the Board did not take place immediately.

On January 11, 1995, the Executive Committee of the Board convened to consider recommendations of the Special Committee of the Board and of the Medical Staff Executive Committee. The Executive Committee unanimously approved a resolution, which *inter alia* accepted the Special Committee's recommendation that the Drake/Blumberg group be awarded an exclusive contract for radiation oncology services at Peninsula Regional. The resolution stated that the decision to enter into an exclusive contract was, in part, based on:

> a documented history of repeated instances of disruptive physician behavior, sometimes in the presence of patients and Hospital staff; inadequate quality assurance programs; and an inability of current Staff physicians to cooperate and work effectively with one another and Hospital employees, all adversely affecting Hospital staff, the orderly operation of the Division, and the quantity and quality of services delivered therein.

Pls.' Mot.Part.Summ.J., at Ex. 6.

The Executive Committee also considered the Medical Staff Executive Committee's recommendations to: (1) grant DeMasi and Anderson medical staff privileges for a two year term,[7] and (2) appoint Strauss as Chairman of the Division of Radiation Oncology. The Committee rejected both recommendations. The Committee instead resolved that the medical staff privileges of DeMasi and Anderson would be granted only on a temporary basis for 90 days, in order to provide DeMasi and Anderson with "a reasonable opportunity to enter into mutually acceptable arrangements" with the Drake/Blumberg group. Pls.' Mot.Part.Summ.J., Ex. 6. The Committee's primary reason for rejecting the Medical Staff Committee's recommendations was based on the fact that approving such recommendations would have prevented Peninsula Regional from entering into the "exclusive" contract with the Drake/Blumberg group for radiation oncology services.[8]

---

**6.** On November 3, 1994, the Board approved a motion that the Special Committee:

> (1) be allowed to execute an exclusive contract with a new leadership [sic] for radiation oncology and the establishment of a single medical unit under a new medical director of Radiation Oncology;
> (2) be given authority to select the group, negotiate, and finalize the exclusive contract; and
> (3) if Drs. Strauss and De Masi are interested in [Peninsula Regional] Medical Center buying their Berlin operation at fair market value[,] that the Committee proceed with appraisals, etc., and finalize [sic] sale based on Board approval.

Akin Aff.Ex. 16.

**7.** Plaintiffs contend: "On or before October 15, 1994, Dr. DeMasi applied for reappointment to the Medical Staff [of Peninsula Regional]. Dr. DeMasi satisfied all qualification and other criteria for Medical Staff membership." Pls.' Mot. Part.Summ.J., at 6 n. 6. Defendant does not dispute this contention.

**8.** The January 11 resolution of the Executive Committee also provided:

> Although the Executive Committee of the Board has been advised by counsel that provisions of the Medical Staff By–Laws relating to appeals by physicians from adverse recommendations or actions concerning privileges may not be applicable in the circumstances, the Executive Committee recommends to the Board that such appeal and hearing rights be

On January 12, 1995, the Board approved the Executive Committee's resolution and formally informed plaintiffs and the other radiation oncologists of the decisions to grant an exclusive contract for radiation oncology services to the Drake/Blumberg group and to provide them with an opportunity to make "acceptable arrangements with the new Medical Directorship." At the next Board meeting on February 2, 1995, a delegation of physicians presented to the Board a unanimously-adopted motion of the Medical Staff to request that the Board rescind its decision to deny DeMasi and Anderson full two-year medical staff privileges. The Board rejected the unanimous recommendation, reaffirmed its prior decision and executed an exclusive contract with the Drake/Blumberg group.[9]

Under the terms of the exclusive contract, Blumberg became Medical Director of the Division of Radiation Oncology. The contract also provided that Blumberg was obligated to "utilize reasonable and appropriate efforts" to hire the existing physician staff of the Division of Radiation Oncology—Strauss, DeMasi, Anderson, North and Edwards—as employees of his practice group. If the incumbent radiation oncologists were unable to become physician-employees of the Drake/Blumberg group, however, their medical staff privileges would terminate on the following dates: Strauss, January 4, 1996; DeMasi, April 15, 1995; Anderson, April 15, 1995; North, January 4, 1996; and Edwards, July 6, 1995. Pls.' Mot.Part.Summ.J., Ex. 5, at Art. 13. In due course, Blumberg made employment offers to all of the radiation oncologists, however, for reasons that are unclear, Blumberg was unable to negotiate agreements with any of them.

There is substantial evidence in the record that Blumberg was perceived by the Medical Staff in general, and by the incumbent radiation oncologists in particular, as an interloper from "across the Bay" and an "out-of-towner" whose presence and managerial control might adversely affect the environment for medical practitioners at Peninsula Regional.

Pursuant to DeMasi's (and presumably Anderson's) request, on March 24, 1995, a hearing began on the issue of whether DeMasi's and Anderson's medical staff privileges were appropriately renewed for only 90 days. DeMasi, Anderson and Peninsula Regional were represented by counsel. Four witnesses testified at the hearing: (1) Gregory W. Lewis, a cancer program consultant; (2) Louis H. Himes, II, M.D., Vice President of Medical Affairs; (3) Sherrie Quillen, Director of Quality Review; and (4) Donald W. Mabe, Chairman of the Board. DeMasi Aff. Ex. 4. After one day of testimony, the hearing was suspended, ostensibly because the issue was moot, in light of the decision to enter into the exclusive contract with Blumberg.

Meanwhile, in a remarkable rapprochement between Strauss, De Masi and North which came to a head on April 6, 1995, the former combatants jointly proposed to the Board that Peninsula Regional purchase the Berlin facility from Strauss and DeMasi and integrate that facility into the hospital's treatment regime, and that Strauss, DeMasi and North be permitted to form a unified practice group to operate the division of radiation oncology. In an effort to assuage concerns over a continuation of earlier incivilities, the Strauss/DeMasi/North proposal included expression of a willingness on their part to accept an "outside" medical director who would not, himself or herself, see patients. This not-so-veiled attempt to oust Blumberg was rejected by the Board, which seemingly rested its decision to reject the proposal on the fact that financially, it would be imprudent to undertake responsibility for the fledgling Berlin facility.

afforded Drs. DeMasi and Anderson as if such By–Law provisions were applicable. Pls.' Mot.Part.Summ.J., Ex. 6.

9. In a contemporaneous February 2, 1995, "Open Letter" to the Peninsula Regional community, the Board alleged, *inter alia*, that plaintiffs had engaged in "a long history of disruptive behavior" which "adversely affected the Medical Center's ability to deliver high quality, efficient care" and had caused "employee stress and morale problems" and that such behavior was continuing. Although plaintiffs were not directly named in connection with these allegations, the Board's intent to impute these behaviors to plaintiffs seems inescapable. However, on summary judgment, plaintiffs are not entitled to the benefit of this inference.

At its May 4, 1995, meeting, the Board did not specifically address renewing DeMasi's and Anderson's staff privileges. Instead, the Board's discussion focused on Blumberg's failure to enter into employment agreements with any of the current radiation oncologists. Blumberg attended the meeting and stated that he was willing to renegotiate his contract so that the current radiation oncologists could be "grandfathered" into his contract. Board members discussed the possibility of "grandfathering" Anderson, Edwards and North "under the provision that they work under [Blumberg's] medical directorship." Akin Aff.Ex. 25. Moreover, an unidentified person at the meeting suggested that Strauss and DeMasi should also be given the opportunity to be grandfathered. *Id.* at 3. However, the Board adopted a motion which authorized the Board to offer only Anderson, North and Edwards an opportunity to be "grandfathered" as practicing radiation oncologists. In late May, Anderson, North and Edwards entered into separate agreements with Peninsula Regional, in which they were allowed to continue their separate practices within the Division of Radiation Oncology "without becoming employees of, or otherwise economically affiliated with, [ ] Blumberg or his associates." Akin Aff.Ex. 26. However, as a cost of this arrangement, these physicians relinquished some indeterminate quantum of protection afforded by the Medical Staff Bylaws; disciplinary actions, including termination, were left within the authority of Blumberg and the Executive Committee of the Board of Trustees.

On June 1, 1995, the Board adopted a resolution which terminated Strauss's and DeMasi's staff privileges effective July 15, 1995 (the "June Resolution"). In the June Resolution, the Board noted that continued exercise of privileges by Strauss and DeMasi would be inconsistent with Peninsula's "goals and objectives." Furthermore, the June Resolution stated that privileges were being terminated because Strauss and DeMasi:

a. Developed a competing facility in Berlin, Maryland;

b. Withheld information concerning the development of such facility from Hospital Administration and Board;

c. .... [U]ndertook to advise the Hospital concerning expansion of its radiation oncology facility without disclosing their adverse economic interest(s), all to the detriment of the Hospital's interest and in furtherance of their own interests; [and]

d. Since completion of their Berlin facility, have operated the same in a manner adverse to the Hospital's interests and in furtherance of their own interests.

Pls.' Mot.Part.Summ.J., Ex. 2. Accordingly, the Board refused to extend DeMasi's privileges and it "suspend[ed], revoke[d], and terminate[d]" Strauss's privileges. *Id.*

## IV. DISCUSSION

■ Under Maryland law, "it is well settled that hospital bylaws have the force and effect of an enforceable contract." *Anne Arundel Gen. Hosp., Inc. v. O'Brien,* 49 Md. App. 362, 370, 432 A.2d 483, 488 (1981); *Sibley v. Lutheran Hosp. of Maryland,* 709 F.Supp. 657, 661–62 (D.Md.1989), *aff'd,* 871 F.2d 479 (4th Cir.1989); *see also Hrehorovich v. Harbor Hosp. Center, Inc.,* 93 Md. App. 772, 789, 614 A.2d 1021, 1030 (1992).[10] This rule establishes that both the hospital's corporate and Medical Staff bylaws are enforceable contracts. *See O'Brien,* 49 Md. App. at 370, 432 A.2d at 488; *Ziegler v. Mercy Health System Corp.,* No. 94–2905, 197 Wis.2d 117, 541 N.W.2d 838, 1995 WL 525250, at *2 (Wis.App. Sept 7, 1995); *Bart-*

---

**10.** The law governing plaintiffs' breach of contract claim is that of the forum state, Maryland. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938). In *West v. American Telephone & Telegraph,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940), the United States Supreme Court held:

> Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is datum for

ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Id.* at 236–37, 61 S.Ct. at 183–84. *See also Wilson v. Ford Motor Co.,* 656 F.2d 960 (4th Cir.1981) (holding that district courts may look to intermediate state appellate court for substantive law).

*ley v. Eastern Maine Medical Center,* 617 A.2d 1020, 1021 (Me.1992); *Islami v. Covenant Medical Center, Inc.,* 822 F.Supp. 1361, 1370 (N.D.Iowa 1992); *Lewisburg Comm. Hosp., Inc. v. Alfredson,* 805 S.W.2d 756, 759 (Tenn.1991); *Terre Haute Regional Hosp. v. El–Issa,* 470 N.E.2d 1371, 1377 (Ind.App. 1984); *Berberian v. Lancaster Osteopathic Hosp. Ass'n, Inc.,* 395 Pa. 257, 263, 149 A.2d 456, 458 (1959); *St. John's Hosp. Medical Staff v. St. John Regional Medical Center, Inc.,* 90 S.D. 674, 679, 245 N.W.2d 472, 475 (1976). *Cf. Gianetti v. Norwalk Hosp.,* 211 Conn. 51, 57–59, 557 A.2d 1249, 1252–53 (1989) (holding that governing board of hospital has pre-existing duty to adopt medical staff bylaws, therefore bylaws do not create a contract, *per se* ). *Contra Munoz v. Flower Hosp.,* 30 Ohio App.3d 162, 166–67 507 N.E.2d 360, 364–66 (1985) (medical staff bylaws do not create an enforceable contract).

▬ In their motion for partial summary judgment, plaintiffs contend (correctly) that the Medical Staff Bylaws constitute a contract between Medical Staff members and Peninsula Regional. Plaintiffs further contend that, by terminating their medical staff privileges while failing to comply with the requirements of the Medical Staff Bylaws, Peninsula Regional breached its contractual obligation. In adopting the Medical Staff Bylaws, plaintiffs assert, Peninsula Regional "bargained away its ability to terminate [m]edical [s]taff privileges without" holding a hearing to find cause. Plaintiffs argue that a refusal to renew privileges or a termination of privileges for alleged "disruptive and inappropriate physician behavior" is specifically addressed in the Medical Staff Bylaws, which afford them certain procedural protections.

Plaintiffs argue they should have been afforded a hearing, in consequence of the termination of their privileges based upon criteria found in Article V of the Medical Staff Bylaws, which governs the evaluation of applications for medical staff privileges. Article V, Section 1 provides enumerated criteria that are considered "[i]n addition to the basic qualifications" of a physician and are "applied to all [physicans] to determine the appointment and reappointment for Medical Staff membership." The list of criteria includes: (i) "[t]he moral character and professional competence of the [physician];" and (ii) "[t]he ability [of the physician] to work compatibly with patients, Medical Staff members, and hospital personnel." Pls.' Mot.Part. Summ.J., Ex. 1, Medical Staff Bylaws, Art. V, Sec. 1, pt. C, ¶ 1, 2.

Plaintiffs maintain that these criteria are identical to the reasons provided in the June Resolution of the Board, which terminated their privileges. The June Resolution stated that plaintiffs had "developed a competing facility," "withheld information," and advised Peninsula Regional's radiation oncology expansion committee "without disclosing their adverse economic interest(s)." Further, the Resolution provided that "for several years" the Board had "attempted to address multiple problems with the Hospital's Division of Radiation Oncology." Hence, plaintiffs argue that because Peninsula Regional decided to terminate plaintiffs' privileges based on criteria which are mirrored in the Medical Staff Bylaws, plaintiffs have a right to a hearing and other review procedures afforded to all Medical Staff members facing such adverse action.

Peninsula Regional does not contest plaintiffs' assertions that the Medical Staff Bylaws constitute a contract and that their medical staff privileges were terminated without a hearing. Rather, Peninsula Regional contends that the Medical Staff Bylaws do not apply to management decisions made by the Board, as the governing body responsible for the operational and financial management of Peninsula Regional.[11] In the

---

**11.** To support the contention that the Medical Staff Bylaws do not apply to the decisions made by the Board in this case, Peninsula Regional points to its corporate bylaws provision which provides:

> Nothing in [the Medical Staff] Bylaws ... shall restrict the power of the Board, or its duly authorized representative, to take such action

with respect to the Medical Staff, or any member thereof, as the Board, or its duly authorized representative, shall deem necessary in the interest of the Hospital and its patients. Akin Aff.Ex. 30, Governing Body Bylaws, Art. VI, Sec. 2. However, the above-quoted provision must be evaluated in light of that portion of the bylaws which states:

view of Peninsula Regional, the Medical Staff Bylaws "apply only to those situations where a physician's privileges are being restricted or revoked due to specific acts or omissions ... related to such issues as professional competence or the provision of patient care." Def.'s Mem.Supp. Cross Mot.Part.Summ.J. & Opp'n Pls.' Mot.Part.Summ.J., at 18. Defendant argues that, in this case, the Board made a "reasonable management decision" to close the medical staff of the Division of Radiation Oncology and to bring in new leadership. Therefore, Peninsula Regional maintains, the hearing and appeal provisions of the Medical Staff Bylaws are inapplicable and plaintiffs were not entitled to an evidentiary hearing to establish cause before the termination of their medical staff privileges.

Simply put, Peninsula Regional contends that plaintiffs misinterpret the Medical Staff Bylaws, arguing: "Were Peninsula Regional to initiate a process either to not re-new staff privileges or to terminate staff privileges under such stated criteria, the physician involved would have certain procedural rights provided by the Medical Staff Bylaws, including an evidentiary hearing." Def.'s Mem. Supp.Mot.Part.Summ.J. & Opp'n Pls.' Mot. Part.Summ.J., at 20. According to Peninsula Regional, a hearing is required only when a physician's privileges are being restricted or revoked due to specific allegations of professional incompetence or neglect which must be reported to federal and state regulatory agencies. The Court concludes for the reasons stated *infra* that Maryland law does not support such a narrow interpretation of medical staff bylaws.

Peninsula Regional contends that plaintiffs' privileges were terminated after the Board made a "reasonable management decision" to solve the problems in the Division of Radia-

tion Oncology by bringing in new leadership and closing the medical staff of the Division. To support its basic contention that it is entitled to summary judgment because of its "management decision" prerogative, Peninsula Regional relies heavily on *Anne Arundel General Hospital v. O'Brien*, 49 Md.App. 362, 432 A.2d 483 (1981), as standing for the proposition that provisions in its Medical Staff Bylaws requiring an evidentiary hearing do not apply to management decisions made by a hospital's governing body. *Id.* at 371, 432 A.2d at 488.

In *O'Brien*, five radiologists [12] brought suit against Anne Arundel General Hospital ("Hospital") alleging breach of contract and other state and federal violations, due to the termination of their medical staff privileges. The radiologists provided "radiology services to the Hospital pursuant to an exclusive contract which expired on June 30, 1980 and pursuant to medical staff privileges granted by the Hospital." *Id.* at 365, 432 A.2d at 485. Before the exclusive contract expired, the Hospital Board decided to create an "imaging department" which was a consolidation of the radiology and nuclear medicine departments. After a formal selection process, the Hospital Board selected an outside physician, Friedman, as the exclusive provider for the imaging department and also appointed Friedman chief of the department. The terms of the contract became effective July 1, 1980.

Friedman was unable to negotiate a contract with the incumbent radiologists and therefore contracted with other physicians. When the incumbent radiologists later submitted applications for medical staff privileges in radiology, the hospital administrator returned the applications to them citing the exclusive contract the Hospital had with

---

no doctor of medicine shall be denied appointment to the Medical Staff, or reappointment ... nor shall privileges previously granted ... be cancelled by the Board of Trustees without prior consultation ... with the Staff. In the event that the Board shall determine to take any action with respect to privileges against recommendation of the Staff, the Board shall again confer with the Staff before its action shall be finally taken. Any affected doctor shall have the privilege of appeal provided by the Staff Bylaws.

*Id.* at Sec. 3. Thus, the provisions of the Medical Staff Bylaws concerning medical staff privileges and the right to a hearing are indisputably enforceable against the Board.

**12.** Four radiologist were shareholders of Frazier, P.A., the association that had the exclusive contract with the Hospital. The remaining radiologist, O'Brien, provided radiology service under an agreement with Frazier, P.A. The court treated all five radiologists alike. *See O'Brien*, 49 Md.App. at 365, 432 A.2d at 485.

Friedman. The radiologists then requested and were permitted to appear before the Medical Board to state their concerns about the status of the radiology department. The concerns raised by the radiologists were communicated to the Hospital Board, which had the matter investigated. The radiologists' exclusive contract and medical staff privileges were nonetheless terminated on June 30.

In their breach of contract suit, the five radiologists "challenge[d] the termination of their privileges[,] which they contend[ed] exist separate and apart from the exclusive contract entered into between [the new radiologist] and the Hospital." *Id.* at 370, 432 A.2d at 488. The radiologists argued, as plaintiffs argue in the instant case, that their privileges could not be terminated without affording them the protections provided in the Hospital's corporate and Medical Staff bylaws. The Hospital, however, argued that the radiologists' staff privileges terminated along with their exclusive contract. Moreover, the Hospital insisted that the radiologists' privileges could not be renewed as a result of the two following Hospital policy decisions: (1) to create the consolidated imaging department, and (2) to appoint Friedman as chief of the new department and as the exclusive provider. *Id.* at 368, 432 A.2d at 487.

The Maryland Court of Special Appeals, in *O'Brien,* found no merit to the argument that the exclusive contract and medical staff privileges were separate and distinct. More important, the court held that the procedure for a hearing and appeal set forth in the Medical Staff Bylaws did not apply. A hearing, the court observed, "contemplates the initiation of an adverse recommendation as to a practitioner which would result in an unfavorable decision on his status as a member of the staff or his right to exercise clinical privileges at the Hospital." *Id.* at 371–72, 432 A.2d at 488. The court added:

> The facts are that an exclusive contract with [the radiologists] has expired and a new exclusive contract has been negotiated with Friedman's P.A. The requirement that the Hospital hold a hearing on what is essentially a management decision vested in the several governing boards of the private hospital was not contemplated by the charter and bylaws of the Hospital.

*Id.* at 373, 432 A.2d at 489. Moreover, the court found that the radiologists received all of the process to which they were arguably entitled by appearing before the Medical Board to discuss the substantive issues concerning the consolidated imaging department. *Id.* at 377, 432 A.2d at 491.

Here, Peninsula Regional maintains that *O'Brien,* as the controlling Maryland case, supports its contention that plaintiffs were not entitled to a hearing, as a result of the management decisions to enter into an exclusive contract with the Drake/Blumberg group and to appoint Blumberg medical director of the division. The Court disagrees with Peninsula Regional's application of *O'Brien* to the facts here, where the facts are viewed in the light most favorable to the plaintiffs.

Although *O'Brien* is instructive in deciding the present case, it is more useful in showing what decisions are *excluded* from the constraints of due process protections otherwise afforded by Medical Staff Bylaws than it is in instructing what decisional environments mandate that those protections must be afforded to individual practitioners.[13] This case is substantially different in several ma-

---

**13.** The usefulness of other cases relied upon by Peninsula Regional similarly is limited on their facts. In *Dutta v. St. Francis Regional Medical Center,* 254 Kan. 690, 867 P.2d 1057 (1994), for example, the Kansas Supreme Court upheld a hospital's decision to exclude a radiologist based upon a "management decision" to enter into an exclusive contract with another radiologist. *Id.,* 867 P.2d at 1062. The court ruled that the medical staff bylaws did not apply in that case because the purpose of the bylaws provision was to deal with matters bearing on professional competency or improper conduct, and no im-

proper conduct was implicated. *Id. See also Gonzalez v. San Jacinto Methodist Hosp.,* 880 S.W.2d 436, 440 (Tex.App.1994) ("The context of the bylaws' procedural requirement indicates that these procedures do not involve matters of administrative decision, but rather deal with matters of professional competence and ethical conduct."); *Bartley v. Eastern Maine Medical Center,* 617 A.2d 1020, 1021 (Me.1992) (holding that hospital bylaws did not apply to emergency room physician's termination because there had been no allegation of unprofessional conduct or privilege reduction).

terial respects from *O'Brien.* First, the court in *O'Brien* found that the radiologists were not entitled to a hearing on the termination of their medical staff privileges because they did not have medical staff privileges independent of their exclusive contract. *See id.* at 373, 432 A.2d at 489. Once the radiologists' exclusive contract expired, the court stated, "the Hospital had no obligation to grant privileges to radiologists who might compete" with the new exclusive provider. *Id.,* 49 Md.App. at 371, 432 A.2d at 488. In the instant case, plaintiffs only had an exclusive service contract prior to June 1992. After that time, the radiation oncology program operated with an open medical staff policy and the North group began competing with plaintiffs' group. Therefore, plaintiffs, in this case, had medical staff privileges independent of an exclusive contract.

Second, unlike the hospital in *O'Brien,* Peninsula Regional did not enter into an "exclusive" contract and close the medical staff of a particular department. Although a "closed" staff was the Board's objective, that objective was not achieved. At the May 4, 1995, meeting, the Board passed a motion providing the existing radiation oncologists with an opportunity to be "grandfathered," and thereby continue practicing within the Division of Radiation Oncology. Viewing the facts in favor of the plaintiffs, it appears that the Board specifically decided not to grant plaintiffs this opportunity. As a result, all of

the other radiation oncologists, Anderson, North and Edwards, were permitted to continue practicing at Peninsula Regional, although Peninsula Regional exacted certain concessions from them in consideration for the continuation of their privileges. These concessions, amounting to a relinquishment of rights guaranteed under the very Bylaws plaintiffs here attempt to vindicate, constitute a high price to pay. Whether there was justification for exacting such a high price is open to debate, but no such factor was present in *O'Brien.*[14]

A third difference between the instant case and *O'Brien* is specific to Strauss. In *O'Brien,* the radiologists' medical staff privileges expired on June 30, 1980, along with their exclusive contract. Here, however, Strauss's medical staff privileges did not expire before the Board terminated them. Strauss held privileges for a two year term, expiring on January 4, 1996. The Board unilaterally decided to terminate Strauss's medical staff privileges five months before they expired.[15] This was done after the Board had entered into the illusory "exclusive" contract with Blumberg, which was predicated on the expectation that Strauss's privileges would terminate on January 4, 1996.

Finally, and perhaps most important, in *O'Brien,* "[n]o suggestion [was] made that the radiologists ... failed to conduct themselves properly while their contract with the

**14.** It is also worth noting that in *O'Brien,* the radiologists were "granted an opportunity to be heard on the substantive decision by the Hospital ... and given an opportunity to apply for the position as chief of the department." *Id.* at 377, 432 A.2d at 491. The court concluded that, according to the hospital's bylaws, the radiologists had the hearing to which they were entitled. *Id.* The court held that the radiologists were only entitled to a hearing on the substantive issue of the Hospital Board's decision to create the imaging department; the radiologists were not entitled to a hearing on the termination of their medical staff privileges. *Id.*

In the present case, a similar conclusion cannot be drawn from the facts. On November 2, 1994, plaintiffs met with the Special Committee of the Board. The substantive issue discussed there involved Peninsula Regional purchasing the Berlin facility and the "exclusive" contract for radiation oncology services. Plaintiffs did not discuss the termination of their medical staff

privileges at this meeting. Akin Aff.Exs. 14–17. Indeed, on November 2, 1984, plaintiffs' privileges had not yet been terminated and the right to a hearing had not yet been implicated. Moreover, the meeting with the Special Committee plainly is not the procedure contemplated by the Medical Staff Bylaws. *See* Pls.' Mot.Part. Summ.J., Ex. 1, Medical Staff Bylaws, at Art. V, Sec. 3.

**15.** A resolution of the Medical Staff suggests that the Board terminated plaintiffs' privileges without consulting with the Medical Staff, as required by the Governing Bylaws of Peninsula Regional. A "Statement of the Medical Staff" reads: "we cannot support the Board's decision to revoke the privileges of Dr. Andrejs Strauss nor its failure to renew those of Dr. Vincenzo DeMasi." The Board's action may have violated the consultation requirement found in Art VI, Sec. 3 of the Governing Bylaws. *See supra,* n. 11.

Hospital was in effect. There [was] nothing to defend." *Id.* at 373, 432 A.2d at 489. Here, despite Peninsula Regional's contention that "plaintiffs were not terminated for disruptive or dishonest behavior," the record (viewed in the light most favorable to plaintiffs) indicates otherwise.[16] As previously discussed, the June Resolution speaks for itself. The Resolution provides that the termination of plaintiffs' medical staff privileges was based, in part, on allegations of dishonesty, concealment of material facts, and self-dealing. *See* p. 536, *supra.*[17] Even the Board's seemingly innocuous decision to award the contact for radiation oncology services to the Drake/Blumberg group was based on "a documented history of repeated instances of disruptive physician behavior ... and an inability of current Staff physi-

cians to cooperate and work effectively with one another." Pls.' Mot.Part.Summ.J., at Ex. 6. It would appear self-evident to this Court that "a doctor faced with charges of this kind must be given a due process opportunity to defend himself." *O'Brien,* 49 Md. App. at 371, 432 A.2d at 488.[18] Accordingly, if the fact-finder were to draw the inferences supported by plaintiffs' contentions as to the true motivations underlying Peninsula Regional's actions toward plaintiffs, *O'Brien* could be interpreted and applied quite justifiably to afford relief to plaintiffs.[19]

As to plaintiff DeMasi, there is further reason to apply *O'Brien* to afford a hearing. The provision of the Medical Staff Bylaws entitled "Review and Action by the Board," states:

16. The Medical Staff Bylaws provide: Any information which indicates that the applicant does not meet standards of performance established for the D[ivision or Department] in which the applicant requested privileges ... shall be the basis of denial of a request for Medical Staff membership. Art. V, Sec. 1., pt. D.

17. In point of fact, Peninsula Regional seems to argue that it had the *option* under the circumstances, either to "discipline" the plaintiffs or to achieve the same result through a "management decision." This might be interpreted as a concession that plaintiffs' interests protected under the Medical Staff Bylaws were indisputably implicated. In any event, as indicated in text, *O'Brien*'s concern for the rights of physicians facing allegations that they "failed in their duties to" a hospital, or "failed to conduct themselves properly" compels the conclusion that where, as here, a dual purpose—discipline and improved operations—constitute the objective of a recision of privileges, and where as here, the *documentation* of the action arguably rests so heavily upon its disciplinary aspect, then a hearing probably ought to be afforded. This, of course, was the approach that the Board commenced as to De-Masi. *See infra* p. 541–42.

18. The Court notes that the Medical Staff Bylaws require a physician applying for privileges to submit any information concerning whether the physician's "membership status and/or privileges have ever been denied, suspended, diminished, revoked, not renewed in any other hospital or institution, or voluntarily or involuntarily relinquished." Art. V. Sec. 1, pt. A, ¶ 1. Such an inquiry illustrates the need for a hearing in which plaintiffs could defend themselves against the Board's allegations; future consequences to a terminated physician could be severe.

The suggestion that Peninsula Regional's termination of Strauss and DeMasi on the ground of

"management decision-making" was pretextual is amply supported in the record. For example, Dr. North, a former adversary of Strauss and DeMasi, is apparently prepared to testify that she was assured in advance that Strauss and DeMasi would not have their privileges renewed and that she, North, would not "go down with Strauss and DeMasi."

19. Peninsula Regional suggests that because the Board's decision was based on "purely management" concerns, plaintiffs have nothing to defend. In their memorandum, plaintiffs provide the following disputed assertions (made by Peninsula Regional during the relevant period) that they intend to defend:

(1) Plaintiffs engaged in disruptive behavior after the recommendations of the Professional Review Committee were implemented in April, 1994 and that disruptive conduct continued into 1995.

(2) Plaintiffs improperly and secretly developed a competing radiation oncology facility.

(3) Peninsula Regional determined to close the *Division of Radiation Oncology* based upon ongoing problems and self-dealing by plaintiffs, but did not terminate plaintiffs' Medical Staff privileges due to individual disruptive or unprofessional conduct.

(4) Plaintiffs' medical staff privileges were terminated because they failed to submit to the supervision of Dr. Blumberg.

(5) Peninsula Regional's decision to close the Division of Radiation Oncology followed two years of management problems and followed several months of careful deliberation. Pls.' Reply Mem.Supp.Mot.Part.Summ.J., at 11–16. The Court agrees that the course of dealing between the parties as documented in the summary judgment record fairly generates these issues for resolution at a "cause" hearing.

In the event that the recommendation of the Executive Committee of the Board of Trustees is not identical to either (a) that of the Executive Committee [of the Medical Staff], or

(b) the applicant's request, such recommendation shall give rise to a right to a hearing.

*Id.* at Art. V, Sec. 2, pt. E, ¶ 3. Based on the undisputed facts surrounding DeMasi's non-renewal, DeMasi had a right to a hearing under this provision. On January 11, 1995, the Executive Committee of the Board considered the recommendation of the Medical Staff Executive Committee to grant DeMasi privileges for a two year term.[20] The Executive Committee of the Board rejected this recommendation, and instead recommended to the Board that DeMasi be granted privileges on a temporary, 90–day basis. The Board adopted its Executive Committee's recommendation. These facts alone appear to give rise to DeMasi's right to a hearing under Article V, Section 2. As the facts developed, DeMasi requested and was granted a hearing, which commenced on March 24, 1995. DeMasi's hearing was suspended after one day of testimony because, according to Peninsula Regional, the incipient decision to "close" the division of radiation oncology made his request for renewal of privileges "moot." The hearing was never resumed.

Of course, the division was not closed, as North, Anderson and Edwards were "grandfathered" notwithstanding the ostensible "exclusive contract" between Peninsula Regional and Blumberg.[21] Furthermore, it is incomprehensible how the propriety of a hearing could have been "moot" after one day of testimony but not on that same day *before*

the hearing began. It must be recalled that the decision to enter into an exclusive contract with Blumberg was made in January. Thus, the timing of the aborted hearing that was offered DeMasi, and the asserted *post hoc* justification for pretermitting it, support plaintiffs' allegations of pretext. The factfinder could well conclude, therefore, by a preponderance of the evidence, that DeMasi was improperly denied the opportunity to exercise his due process rights under the Medical Staff Bylaws.[22]

Peninsula Regional seems to argue in the alternative that the "disruptive behavior" that necessitated new leadership in the Division of Radiation Oncology involved physicians other than plaintiffs. The Court, however, has not been provided with even a scintilla of evidence to support this argument. In any event, the record provides ample evidence to support the inference that plaintiffs, especially DeMasi, had been guilty of "disruptive behavior" and therefore that Peninsula Regional intended to discipline on that basis. On two occasions, North wrote letters to Peninsula Regional administration, complaining that plaintiffs were uncooperative and that DeMasi had assaulted her in front of patients. Akin Aff.Ex. 3, 4. These incidents were the impetus which led to the creation of the Division of Radiation Oncology. Despite several structural changes to separate the two competing groups, "the problems with the Division continued." Def.'s Mem.Supp.Mot.Part.Summ.J. & Opp'n Mot.Part.Summ.J., at 8. Even viewing the facts and the inferences to be drawn from the facts in favor of defendants, the Court concludes that the "disruptive behavior" referred to in the June Resolution (and other

---

**20.** At this meeting, the Executive Committee of the Board also rejected the recommendation to appoint Strauss chairman of the Division of Radiation Oncology. Plaintiffs do not challenge this decision of the Board. *See Hrehorovich,* 93 Md.App. at 789, 614 A.2d at 1030–31 (holding that hospitals are not required to follow the "due process" provision of medical staff bylaws when terminating administrative positions).

**21.** Neither party has offered expert evidence as to whether the hybrid arrangement ultimately accepted by Blumberg in respect to North, Anderson and Edwards is fairly characterized as a "closed staff."

**22.** Article V, Section 3 of the Medical Staff Bylaws also provides that, at a hearing, the physician involved has the right to call, examine and cross-examine witnesses; to present evidence determined to be relevant by the hearing panel, regardless of its admissibility in a court of law; to submit a statement at the close of the hearing; to receive the written recommendation of the panel, including a statement of the basis for the recommendation, upon completion of the hearing; to file an appeal to the Board of Trustees. Art. V. Sec 3, pts. A–C.

documents) involved plaintiffs. Therefore, if that were the actual motivation for plaintiffs' termination, rather than the benign management decision urged by Peninsula Regional, then pursuant to the Medical Staff Bylaws, plaintiffs must be afforded the opportunity to defend themselves against these allegations, because they constitute allegations that they "failed to conduct themselves properly" under *O'Brien*, 49 Md.App. at 373, 432 A.2d at 489, and that each "has failed in his duties to" Peninsula Regional. *Id.* at 371; 432 A.2d at 488.

▆▆ Peninsula Regional also argues that an evidentiary hearing is not required in this case because the termination of plaintiffs' medical staff privileges cannot be considered an adverse professional review decision under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.* Additionally, it claims that no hearing was necessary because it was not required to report the terminations to the State of Maryland Board of Physician Quality Assurance as an action reflecting adversely on plaintiffs' ability to practice medicine. This Court is not persuaded by this question-begging. The flaw in the contention lies in the fact that the question of whether to report the termination of plaintiffs' privileges to federal and state agencies in compliance with governing standards is irrelevant to defendant's obligation to follow the procedures set forth in the Medical Staff Bylaws, a contractual duty. No reason is evident why there should be any such equivalence in these areas; the indisputable need for due process in one context is scant reason to refuse to find it provided in a less harmful context. If Peninsula Regional wanted such a standard embodied in the Medical Staff Bylaws, it could

have bargained for such a provision, but it did not, settling instead for a broadly-worded provision extending protection to an attack on a physician's "moral character" and his or her ability to "work compatibly with patients, Medical Staff members, and hospital personnel." *See* p. 537, *supra.*

Finally, Peninsula Regional contends that if the Court accepts plaintiffs' theory of the case, the logical extreme would be that physicians would have a "vested interest" in their medical staff privileges and that Peninsula Regional would not be able to make management decisions without being subject to the hearing requirements of the Medical Staff Bylaws. However, as the court stated in *Redding v. St. Francis Medical Center*, 208 Cal.App.3d 98, 255 Cal.Rptr. 806 (1989):

> There is ... a definite distinction in the case law between the intentional actions of a hospital *directed specifically toward the exclusion of a particular physician or groups of physicians*, and the actions of a hospital which may, as a practical matter, result in the exclusion of individual practitioners but were undertaken for less personally directed reasons. Cases in the first category have protected physicians; cases in the latter category have often balanced the equities in favor of the hospitals.

*Id.* at 104, 255 Cal.Rptr. at 809. (emphasis added) The instant case very likely falls within the first category, however, only *factfinding* can disclose whether it does.[23]

## V. CONCLUSION

For the aforementioned reasons, this Court concludes that the presence of disputed material factual inferences as to whether Peninsula Regional culpably failed to comply

---

**23.** Defendant also maintains:

> By failing to come to acceptable terms with Dr. Blumberg and Peninsula Regional under which they would submit themselves to Dr. Blumberg's leadership, plaintiffs placed the Board in a position of having to make the necessary management decision to terminate plaintiffs' privileges in order to meet the goals and objective of the policy of requiring a closed staff for the Division of Radiation Oncology.

Mem.Supp.Def.'s Mot.Part.Summ.J. & Opp'n Pls.' Mot.Part Summ.J., at 17. The facts under-

lying this argument are clearly in dispute. In their affidavits, plaintiffs testify that they "submitted" themselves to Blumberg's leadership from January 1995 through their termination in July 1995 without any problems. According to plaintiffs, the only reason they did not reach agreement with Blumberg and Peninsula Regional was because, unlike Anderson, Edwards and North, they were never offered the opportunity to be "grandfathered." Whether plaintiffs and defendant engaged in good faith negotiations throughout their dealings is not for this Court to decide on the present record, as a matter of law.

with applicable procedures set forth in the Medical Staff Bylaws in terminating plaintiffs' medical staff privileges without affording plaintiffs a full and fair hearing precludes summary judgment for either party. There can be little question but that the Board of Trustees made what on its face is a "management decision" when it elected to bring order to the radiation oncology program by undertaking to reorganize it. However, the summary judgment record establishes as a matter of law that the Board acted on the basis of mixed motives. The potential for harm arising from the Board's undisputed actions to plaintiffs' reputational, professional and economic interests was real and substantial; the Bylaws are intended, in part, to protect those interests.

Moreover, the Court believes that the evidence that has been included in the summary judgment record generates a genuine issue of the Board's *"good faith."* See *O'Brien,* 49 Md.App. at 373, 432 A.2d at 490 (*quoting Lewin v. St. Joseph Hospital of Orange,* 82 Cal.App.3d 368, 385, 146 Cal.Rptr. 892 (1978) (emphasis added)). Reasonable persons might disagree whether on this record the Board acted from an animus specific to plaintiffs. Plaintiffs have the burden to persuade by a preponderance of the evidence that the mixed motives and methods resorted to by the Board in terminating their privileges fall on the permissible or the impermissible side of the line sketched by *O'Brien,* that is, between the legitimate, good faith exercise of a hospital board's fiduciary duties, on the one hand, and mischievous, pre-textual decision-making animated by a desire to avoid due process hearing procedures where in fairness those procedures should be invoked, on the other hand. This determination cannot be achieved in the summary judgment context. Accordingly, plaintiffs' cross motion for partial summary judgment and Peninsula Regional's cross motion shall be denied.