723 A.2d 463

**Edward E. VOLCJAK**

v.

**WASHINGTON COUNTY HOSPITAL ASSOCIATION, et al.**

**No. 240, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Jan. 5, 1999.

Reconsideration Denied Feb. 23, 1999.

482

Conrad W. Varner (Frederick W. Goundry, III and Varner & Kaslick, on the brief), Frederick, for appellant.

Kathleen A. Ellis (Lewis A. Noonberg and Piper & Marbury L.L.P., on the brief), Baltimore, for appellee, Washington County Hospital Association.

Daniel R. Chemers (David W. Erb and Weinberg & Green, L.L.C., on the brief), Baltimore, for appellee, Blue Ridge.

Argued before WENNER, SONNER and ADKINS, JJ.

ADKINS, Judge.

Appellant, Edward E. Volcjak (Volcjak), sued Washington County Hospital Association (WCHA or hospital) in the Circuit Court for Washington County because the hospital terminated his clinical privileges in anesthesiology without providing him a hearing when it entered an exclusive contract with a group of anesthesiologists. Volcjak also sued the group that obtained the exclusive contract, Blue Ridge Anesthesia Associates, LLC (Blue Ridge). The court granted summary judgment in favor of the hospital on Volcjak's contract and tort claims against the hospital, and dismissed with prejudice his contract and tort claims against Blue Ridge.

## FACTUAL AND LEGAL BACKGROUND

Volcjak held clinical privileges in anesthesiology at WCHA from 1974 until termination of those privileges by WCHA in 1996. The catalyst for the hospital's decision to terminate Volcjak was a severely critical report of the division of anesthesiology at WCHA issued by the United States Department of Health and Human Services, Health Care Financing Administration (HCFA). At the time HCFA conducted its survey and issued its report, Volcjak was Chief of the WCHA Anesthesiology Division.

### HCFA Report and Hospital Response

In February of 1995, HCFA issued a report outlining certain alleged breaches in the standards of clinical practice occurring in the anesthesiology division at WCHA. The HCFA report alleged, in part, that the anesthesiologists were: (1) administering anesthesia while at the same time supervising the provision of anesthesia services by certified registered nurse anesthetists,[1] (2) leaving anesthetized patients unattended, (3) failing to require pre-anesthesia evaluations of patients, (4) failing to record the intra-operative condition of patients, and (5) failing to prepare post-anesthesia reports for anesthesia patients.

The HCFA report contained specific criticisms of the Chief of Anesthesiology, although Volcjak was not mentioned by name. These were as follows:

1. The Chief of the [division] of Anesthesiology has not carried out his responsibilities as defined in the department's Rules and Regulations. These responsibilities include the formulation and enforcement of policies and procedures in accordance with sub-department approval for the standard of practice of anesthesiology in the operating room and other areas in the hospital where anesthesiology services may be offered, and assuring at least annual review of

---

1. A certified registered nurse anesthetist is known as a "CRNA", and shall be referred to as such in this Opinion.

these policies and procedures. Examples of the lack of enforcement of policies include:

a. Registered nurses are allowed to perform pre and post-anesthesia evaluations when the policies require that this function be performed by an anesthesiologist.

b. Post-anesthesia follow-up reports are not documented in the patients' medical record. . . .

c. Problems and complaints regarding physicians' attitudes, clinical practice patterns and availability for services have been identified; . . .

2. . . . [M]edications (including sedatives, tranquilizers and anesthetics) were left unlocked and unsupervised. This situation presents a scenario for unaccountable drug loss and safety concerns if removed by unauthorized individuals.

The Board of Trustees was advised of the HCFA report and it responded in a Resolution, issued on March 30, 1995, which, in pertinent part, provided:

WHEREAS, in December of 1994 the Division of Anesthesia was surveyed by [HCFA] as a result of a complaint of practices suspected of constituting Medicare fraud, which survey resulted in a list of criticisms . . . [of the Division of Anesthesia] . . . and

WHEREAS, as a result of the findings during the December 1994 survey, HCFA . . . return[ed] in February 1995 for a more extensive investigation; said investigation resulting in a draft report concluding this Hospital to be out of compliance with Medicare Conditions of Participation primarily because the Division of Anesthesiology was not performing quality improvement activities, did not have adequate rules and regulations, was not practicing in accordance with its own rules and regulations nor with HCFA standards, was careless with the handling of controlled substances, was not supervising CRNA's [sic] properly, was not responding to reported clinical deficiencies, was fragmented into separate groups and independent practitioners, and did not have effective leadership; and

WHEREAS, legal counsel to this Hospital and Hospital Management have both advised this Board of the following actions that may result from the critical OLCP survey and report, some of which appear below in order of severity:

—Full survey of the total Hospital operation

—Removal of this Hospital's "deemed status"

—Imposition of a Corrective Action Plan

—Initiation of the Medicare decertification process by HCFA

WHEREAS legal counsel and Hospital Management have both explained the consequences of any of the above actions upon this Hospital's reputation and especially upon this Hospital's relationship with its current public financing agencies and the impact on future borrowing needs; and

WHEREAS, the Executive Committee of this Board on March 20, 1995, saw the need for swift, decisive action and acted on its authority by authorizing the President to implement one or more of the following actions:

a. Employ or contract with a Chief of Anesthesia pursuant to a detailed written contract.

b. Contract with a group to perform anesthesiology services on an exclusive basis.

c. Employ or contract with a Chief of Surgery[.]

The Executive Committee further stated that the anesthesiologists presently practicing at the Hospital be given an opportunity for a limited time to consolidate their practices and contract with the Hospital; and

\* \* \*

NOW THEREFORE, it is this 30th day of March 1995,

RESOLVED, that this Board does hereby authorize and direct the President of the Hospital to implement one or both of the following actions:

a. Employ or contract with a Chief of Anesthesia pursuant to a detailed written contract.

b. Contract with a group directing the group to provide direction, supervision and operation of the Anesthesiology Division on a sole and exclusive basis.

RESOLVED, that the anesthesiologists practicing at this Hospital shall be afforded an opportunity to contract with the Hospital to serve as the Chief of the Division or to provide services as a consolidated group on an exclusive basis but such opportunity shall be on the same terms and under the same circumstances as are offered to all others.

RESOLVED, that henceforth all medical staff appointments and reappointments and clinical privileges granted prior to the execution of ... an exclusive anesthesia group shall be expressly limited, pursuant to the authority of this Board and further pursuant to the provisions of Section 9.5–7 of the Medical Staff Bylaws, in a manner that is consistent with the actions authorized by this Resolution.

RESOLVED, that henceforth all medical staff appointments and reappointments and clinical privileges in the Division of Anesthesiology granted after the execution of a contract with an exclusive group or with a Chief to operate the Division shall be contingent upon and coterminous with the Hospital's contract with the group or with the Chief.

* * *

RESOLVED, that in the event the Hospital contracts with a group to operate the Division of Anesthesiology on an exclusive basis or with a Chief to operate the Division, the clinical privileges of all anesthesiologists and CRNA's [sic] who do not become part of the contract group may be terminated at the discretion of the Board.

The president of WCHA also advised newspapers of Washington County that, because of the allegations in the report, the hospital was in danger of losing its Medicare funding.

On April 11, 1995, the president and CEO of the hospital prepared a document entitled "Plan of Action." In the Plan of Action, the president indicated that the Executive Committee of the WCHA Board had authorized him to take steps to

institute an exclusive arrangement for anesthesia services at the hospital. In this document, the CEO stated in part:

Most everyone believes that the clinical quality provided by our Anesthesiologists is good, but recent events bring that issue into serious question. Are lack of supervision of CRNAs, inadequate QA reviews and careless handling of controlled substances not issues of clinical quality? The lack of any consistent management and failure to maintain compliance with regulatory standards places the Hospital in an intenable [sic] position. It is clear that we cannot allow these conditions to continue.

Volcjak's most recent two-year term of privileges was scheduled to expire in October of 1995. By letter of September 29, 1995, WCHA informed Volcjak that he was granted reappointment to the Medical Staff and granted clinical privileges in anesthesiology, but subject to one significant new condition:

Your reappointment and clinical privileges are further conditioned by the business decision of the Board of Trustees to grant a person or group ("Provider") the exclusive rights to manage and provide anesthesia services at the Hospital. The Hospital is actively seeking such a Provider and expects to enter into a written contract with them in the near future. When such a contract is finalized, your clinical privileges and membership will be terminated unless you are selected as the exclusive Provider or you contract with or become employed by the Provider.

On November 1, 1995, Volcjak's attorney, Conrad Varner (Varner), wrote to WCHA, requesting a hearing concerning the hospital's letter of September 29.[2] Varner asserted that the September 29 letter constituted a recommended adverse action under 12.2 of the Medical Staff Bylaws, thus entitling

---

2. Volcjak did submit a proposal to WCHA to become the exclusive provider. The record does not reflect the date on which this proposal was made. Either Volcjak or his partner, Dr. Bunker, was interviewed by WCHA in connection with this proposal.

Volcjak to a hearing.[3] No hearing was thereafter granted by WCHA to Volcjak.

## Hospital Contract With Blue Ridge and Termination of Volcjak's Privileges

On November 3, 1995, WCHA wrote to Volcjak advising him that the Board had decided to pursue an exclusive contract with Capital Anesthesia, Inc. (the corporate predecessor to Blue Ridge, hereinafter, Capital), and had begun contract negotiations with that group on October 27. On November 2, 1995, a letter was mailed to Volcjak by Dr. Dan Lawson, on behalf of Capital advising that at the request of WCHA, Capital would be conducting interviews of the anesthesiologists currently privileged at WCHA with a view towards future employment with Capital. In pertinent part, that letter provided:

> Over the next several weeks we will organize a series of interview sessions, to take place in Hagerstown. Interviews will be conducted on several different evenings in order to accommodate your scheduling needs.

> If you have an interest in our plans for the provision of anesthesiology services at the hospital, we would be delighted to hear from you. Please call us at 301–495–3032 to arrange an appointment for an interview. In addition, we will need a letter, accompanied by a current C.V. and the names of three professional references on your behalf. In all cases, we would appreciate being given a reliable phone number or pager number so that we may efficiently contact you to make these arrangements.

> [We] are very interested in hearing from you and we look forward to meeting you in the next several weeks.

Volcjak called and spoke with Dr. Lawson, who advised that Volcjak would be contacted about an interview.

---

**3.** According to Varner, the letter was received by Volcjak on October 3. Thus, it appears that Varner's letter fell within the thirty day period in which to request a hearing provided for in section 12.2 of the Medical Staff Bylaws.

Volcjak had not heard from Capital with respect to an interview when he, by letter dated December 19, 1995, requested a leave of absence from the WCHA Medical Staff to attend to family matters. Leave was granted to Volcjak.

On January 25, 1996, WCHA entered into a contract with Blue Ridge, a limited liability company formed by the principals of Capital, to provide, on an exclusive basis, all services for anesthesiology at the hospital. In that contract, the WCHA agreed to indemnify Blue Ridge from all claims filed by any anesthesiologist having clinical privileges at the hospital prior to the contract. Immediately following the hospital's promise to indemnify Blue Ridge, the contract continued as follows:

To reduce the possibility of suits by anesthesiologists ... [Blue Ridge] agrees to evaluate those providers rendering Anesthesia Services at the Hospital and to consider them for long term employment or contract by using at least the following criteria: Education, experience, clinical skills and malpractice claims history.

On February 7, 1996, WCHA, by letter, advised Volcjak that the hospital had entered into an exclusive contract with Blue Ridge for the provision of anesthesia services at WCHA, and that:

Unless you make arrangements with Blue Ridge to provide services as its employee or contractor, your membership and privileges will be terminated shortly, in which case you will be notified in early March of the effective date of termination. As soon as your membership and privileges are terminated your leave of absence will automatically expire.

On February 16, 1996, WCHA sent another letter to Volcjak advising that Blue Ridge would commence providing clinical services on March 18, 1996, and stating that:

This letter constitutes the anticipated notice to you that unless you have made arrangements with Blue Ridge by March 18, 1996 at 6:00 A.M. your clinical privileges and Medical Staff membership shall automatically terminate as

of 6:00 A.M., March 18, 1996. We thank you for your service and wish you well.

[WCHA has] been advised that a termination of clinical privileges under these circumstances is *not* an event that requires the Hospital to report to the National Practitioners Data Bank.

Volcjak called Dr. Lawson and spoke to him on February 28. Lawson advised Volcjak that Capital was no longer taking applications for anesthesiologists. A letter was sent by Blue Ridge to Volcjak on the same date advising him as follows:

Thank you for your interest in [Blue Ridge]. After reviewing our personnel requirements, we are no longer accepting physician applications. You are welcome to forward a copy of your CV which we will keep on file for the future.

The letter was signed by the Personnel Manager of Blue Ridge. In fact, positions with Blue Ridge for anesthesiologists were not closed at the time of the letter, and subsequent thereto, Blue Ridge hired another anesthesiologist to work at WCHA.

Volcjak again requested a hearing on the "hospital's threatened action to cancel [his] leave of absence and his privileges," this time by letter dated March 21, to the WCHA Chief of Staff. This request was denied, and WCHA, through its attorneys, confirmed by letter of March 26 that Volcjak's privileges had automatically expired when he failed to contract with Blue Ridge.

### WCHA Medical Staff Bylaws

The Medical Staff Bylaws of WHCA, governing relations between the hospital and its doctors, address when a physician shall be entitled to a hearing in section 12.2. That section states, in part:

Except as otherwise specified in these Bylaws, any one or more of the following actions or recommended actions shall be deemed actual or potential adverse action and constitute grounds for a hearing:

\* \* \*

(c) denial of Medical Staff reappointment;

(d) demotion to lower Medical Staff category or member-ship status;

\* \* \*

(f) revocation of Medical Staff membership;

\* \* \*

(h) involuntary reduction of current Clinical Privileges . . . ;

\* \* \*

(j) termination of all Clinical Privileges . . .

\* \* \*

(*l* ) denial of reinstatement after leave of absence. . . .

A physician member is entitled, under section 12.3–1, to notice of the recommendation made or action proposed to be taken, and notice of his right to a hearing. The member has thirty days following receipt of notice of the action or recommenda-tion to request a hearing. When requested, the hearing will be held before an impartial review committee, consisting of at least five members of the medical staff, who are appointed by the Chief of Staff. A staff member entitled to a hearing has a right to be represented by an attorney at the hearing. The Bylaws provide, in section 12.4–5:

> At the hearing, unless otherwise determined for good cause, the Medical Staff shall have the initial duty to present evidence for each case or issue in support of its action or recommendation. The Member shall be obligated to pres-ent evidence that the adverse action lacks substantial factual basis or that such conclusions drawn therefrom are either arbitrary, unreasonable, or capricious. Throughout the hearing, the affected Member shall have the burden of demonstrating compliance with all applicable criteria and of resolving any doubts that may arise.

The Hearing Committee is required under section 12.4–8 of the Bylaws to "render a decision, which shall be accompanied by a report in writing stating findings of fact, conclusions and recommendations." Section 12.5–1 provides:

> If the Hearing Committee recommends that a Member be suspended, terminated, or curtailed from his present position on the Medical Staff, or its recommendation in any way adversely affects his present status, the CEO shall notify him that the recommendation will be forwarded to the Professional Affairs Committee of the Board of Trustees and thereafter to the Board of Trustees for final action unless the Member requests an appeal before the Board of Trustees within fourteen (14) days of the date he receives the notice.

The Medical Staff, in its various committee functions, is not "an entity separate and distinct from the Hospital, but rather an integral part of its functions." Bylaws, Article II, § 2.1. The Board of Trustees takes its final action regarding all privileging decisions "in accordance with its governing by-laws." Section 12.5–1. The review of the application of a medical staff member for reappointment for privileges is based on professional qualifications, clinical skill, demonstrated competence, quality assurance, adherence to hospital standards and similar criteria. See Bylaws, § 9.6–3.

## ISSUES

Volcjak asks us to review whether the trial court erred as a matter of law when it entered summary judgment in favor of the hospital and Blue Ridge, thereby dismissing Volcjak's claims that: 1) the hospital breached its contractual obligation to him under the Medical Staff Bylaws when it terminated his clinical privileges without affording him a hearing; 2) he was a third party beneficiary entitled to enforce the contractual obligation undertaken by Blue Ridge in its contract with the hospital to consider Volcjak for employment, and that Blue Ridge breached this contract; 3) the hospital's termination of his clinical privileges constituted tortious interference with his economic relations; and 4) the refusal of Blue Ridge to

consider his application for employment constituted tortious interference with his economic relations with patients at WCHA.

## STANDARD OF REVIEW

 Maryland Rule 2–501(e)provides that a court may grant a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In considering a motion for summary judgment, the trial court does not determine any disputed facts, but instead rules on the motion as a matter of law. *See Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993); *White v. Friel*, 210 Md. 274, 285, 123 A.2d 303 (1956). The court views the facts, including all inferences, in the light most favorable to the party against whom the court grants the judgment. *See Beard v. American Agency Life Ins. Co.*, 314 Md. 235, 246, 550 A.2d 677 (1988).

In reviewing the trial court's decision, we must determine whether the trial court was legally correct in granting summary judgment, since a trial court decides issues of law, not fact, when granting summary judgment. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). We are therefore confined to the basis relied on by the trial court in our review. *See Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994).

## DISCUSSION

### I.

### Breach of Contract Count Against the Hospital

 Appellant, in his breach of contract claim against the hospital, asserts that WCHA breached his contractual rights under the Medical Staff Bylaws by refusing to give him a hearing when it decided to terminate his privileges. Both Volcjak and the hospital agree that the WCHA Charter and

Bylaws, and the Medical Staff Bylaws constitute a contract between them.[4] *See Anne Arundel Gen. Hosp., Inc. v. O'Brien,* 49 Md.App. 362, 370, 432 A.2d 483 (1981). The hospital contends that the Bylaws do not apply when WCHA terminates privileges of a medical staff member as the result of a decision to enter into an exclusive contract, and that the Bylaws require the hospital to afford the physician a hearing only when it formally accuses the physician of professional misconduct. WCHA bases its position upon what it views as a reasonable reading of the Bylaws themselves, as well as case law interpreting similar bylaws in other cases.

First, we shall examine the language of the Bylaws. The Bylaws, by their explicit terms in section 12.2, clearly provide that certain "actions or recommended actions shall be deemed actual or potential adverse action and constitute grounds for a hearing[.]" Denial of Medical Staff reappointment, involuntary reduction of current clinical privileges, revocation of Medical Staff membership, termination of clinical privileges, and denial of reinstatement after leave of absence are enumerated as events included within the definition of "adverse action." Certainly, based upon a reading only of section 12.2, the actions by WCHA regarding Volcjak's clinical privileges at WCHA and his membership on the WCHA Medical Staff constitute an "adverse action."[5] Further, there is nothing in the explicit language of section 12.2 that suggests the hearing right of the physician is limited to instances in which professional misconduct is formally alleged.

WCHA asks us to look beyond section 12.2, and call upon rules of contract interpretation requiring that a court look to the meaning of a contract in its entirety, and if reasonably possible, give effect to each clause. WCHA argues that its interpretation of section 12.2 is supported by other provisions

---

**4.** WCHA asserts that Volcjak's reappointment letter dated in September is also a contract. Nothing ·in that letter, however, relates to the issue of Volcjak's entitlement to hearing.

**5.** We see the September 30, November 3, February 7, February 26 and March 18 letters as part of a continuum constituting the adverse action.

of the Medical Staff Bylaws that are indirectly related to the question of when a physician is entitled to a hearing. Specifically, WCHA references the language in the Bylaws that explains that the Medical Staff is "subject to the ultimate authority of the Board of Trustees," that the Medical Staff must "comply with the responsibilities of Medical Staff membership, with the Bylaws and Rules and Regulations of the Medical Staff, and with pertinent Hospital policies and procedures." The hospital also asks us to consider the overall purpose of the Medical Staff Bylaws, i.e. "to establish principles of governance and accountability to assure the public of quality care by the Medical Staff." We have reviewed all of these provisions and find none inconsistent with the explicit terms of section 12.2, establishing the grounds for a physician's entitlement to a hearing. Further, contrary to the hospital's contention, the procedural protections offered to a physician under Article XII of the Bylaws cannot reasonably be viewed as inconsistent with the ultimate authority of the Board of Trustees of the hospital. Rather, the hearings provided for in Article XII are designed to provide the Board of Trustees with a full factual report and recommendation by neutral members of the Medical Staff after such members have listened to evidence, in a fair forum, about the reasons for the adverse action taken against the physician. With such report in hand, the Board is far better equipped to make an informed decision, based upon a full consideration of the issues at hand. Without such hearing and report, the Board is more vulnerable to the possibility of a decision influenced unduly by rumor and innuendo, or even by an administrator who may have an uninformed or one-sided view of the facts.

In its next argument, WCHA draws our attention to specific sections of the Bylaws that cross reference section 12.2. It points out that these particular sections cross-reference the general hearing provisions of section 12.2, and argues that Volcjak was not entitled to a hearing because none of these particular sections mentions termination of a physician's privileges in order to enter an exclusive contract. The hospital's own corporate resolution, however, belies this argument.

In its March 30, 1995 resolution adopting the plan to enter an exclusive contract, the Board resolved that any medical staff appointments or reappointments made before an exclusive contract was finalized would be made expressly subject to the pending contract. In so resolving, the Board stated that it was doing so pursuant to its authority and "further *pursuant to the provisions of Section 9.5–7* of the Medical Staff Bylaws." (Emphasis added). Section 9.5–7 states: "The relevant provisions of Article XII shall govern when the action of the Board of Trustees is adverse to an applicant or Member, as more fully described in Article XII." Article XII, titled "Hearings and Appellate Reviews" includes section 12.2, the very section at issue. Thus, at the time of taking the first step in the termination process, the hospital asserted its right to do so pursuant to a Bylaw section that contemplated a hearing for the affected physician.

The hospital's contention that the hearing provision is never applicable when an exclusive contract is involved also diverges from the intent expressed in other sections of the Bylaws. Section 12.6–1 specifically addresses the applicability of the hearing provisions to a Medical Staff Member who is under contract with the hospital or in a "closed department[ ]." That section states:

> Members who are directly under contract with the Hospital in a medical-administrative capacity or in closed departments shall be subject to these Bylaws, and also shall be entitled to the procedural rights specified in Article XII unless the contract prohibits a procedural appeal.

The Bylaws do not define "closed department," but the term is commonly understood to mean a department that allows only the members of an exclusive group, or those under contract with such group, to have privileges in a particular field. *See O'Brien,* 49 Md.App. at 373, 432 A.2d 483 (suggesting this definition of "closed staff"); *Strauss v. Peninsula Reg'l Med. Ctr.,* 916 F.Supp. 528, 532 n. 4 (D.Md.), *aff'd,* 86 F.3d 1152 (4th Cir.1996) (defining "closed medical staff" in a similar manner). Volcjak has also attested to this understanding of the term by affidavit in the record. Assuming this

definition of "closed department," this Bylaw provision means that even someone who has previously signed an exclusive contract with the hospital has the right to a hearing upon termination of his contract and privileges, unless he has explicitly waived that right in the contract. WCHA asks us to hold, as a matter of law, that the Bylaws should be read to mean that Volcjak, who has signed no contract containing a waiver, foregoes his right to a hearing upon termination of his privileges simply because the hospital decided to resolve the problems in the department of anesthesiology by entering an exclusive contract with *other* physicians. We decline to read the Bylaws in that manner because we find such result to be inconsistent with the broad language in section 12.1, the intent expressed in section 12.6–1, and the hospital's own corporate resolutions involving this matter.

### Discussion of Cases Interpreting Similar Bylaws

WCHA would have us read the decision of this Court in *O'Brien* as controlling precedent requiring that we disregard the plain language of the Bylaws. In that case, the plaintiff physicians whose privileges were terminated claimed entitlement to a hearing, pursuant to a Medical Staff bylaw provision requiring a hearing before a committee of the Medical Staff when any physician "receives notice from the ... Administrator that his appointment or status as a member of the staff or the exercise of his clinical privileges will be adversely affected...." *Id.* at 370 n. 3, 432 A.2d 483.[6] We held that Anne Arundel General Hospital (AAGH) was not required, pursuant to its bylaws, to hold a hearing regarding the termination of privileges of AAGH's radiologists when their exclusive contract to provide radiological services to AAGH expired, and they were unable to reach an agreement as to the terms and conditions of a new exclusive contract. *See id.* at 378, 432 A.2d 483.

---

**6.** We considered this provision to be the fulfillment of a general bylaw requirement of "notice and opportunity for a hearing in compliance with due process requirements" when privileges were suspended or terminated. *Id.* at 376, 432 A.2d 483.

There are several important differences between *O'Brien* and the present case. First, the plaintiffs in *O'Brien* had obtained privileges at AAGH only pursuant to the terms of their exclusive contract to provide radiological services that contained explicit provisions for what would occur when the contract expired. *See id.* at 366, 432 A.2d 483. The most recent extension of the contract, made in January 1980, provided:

1. The terms of the Agreement are extended until June 30, 1980 at which time it shall automatically terminate without any notice or action on the part of either [AAGH] or the Radiologists.

2. It is expressly acknowledged and agreed that after June 30, 1980 there shall be no agreement in effect between [AAGH] and Radiologists or between [AAGH] and any physician officer, shareholder, employee or contractor of said Radiologists, unless said agreement is in writing and duly executed by the parties thereto after February 1, 1980.

*Id.* We explicitly rested our decision, in part, upon this automatic termination provision in the plaintiffs' contract. *See id.* at 377–78, 432 A.2d 483. By contrast, Volcjak never entered into an exclusive contract with the hospital, and never signed a provision stating that his privileges would automatically terminate on a certain date without notice or action by WCHA.[7] Rather, the contract that he had with the hospital, the corporate and Medical Staff Bylaws, provided that he would be

---

7. One of the physicians, O'Brien, was a subcontractor of the group that signed the exclusive contract. He claimed that he stood in a different provision because he did not sign the contract, and so his privileges did not expire with the expiration of the co-plaintiffs' contract with AAGH. We rejected this claim, saying that O'Brien was entitled to exercise his privileges only during the exclusive contract with Frazier P.A., and that he had admitted in his testimony that his future privileges were dependent upon his ability to negotiate an agreement with the exclusive provider. *See O'Brien*, 49 Md.App. at 376–78, 432 A.2d 483. Unlike O'Brien, Volcjak's privileges did not depend upon his subcontract with an exclusive group that had signed such agreement as O'Brien's did. There was no prior exclusive contract for anesthesiology services at WCHA.

given a hearing if there was any adverse action regarding his privileges.

WCHA urges that the automatic termination of privileges provision in the plaintiffs' contract in *O'Brien* was not critical to our decision. Rather, it urges us to interpret *O'Brien* broadly as holding that a bylaw provision for a hearing will never apply when a hospital makes what it characterizes as a "business decision" to enter an exclusive contract for services within a particular medical speciality or sub-speciality.

The United States District Court for Maryland, applying Maryland law, declined to give *O'Brien* the broad meaning ascribed by WCHA in a case similar to the one *sub judice*, decided in 1996. *See Strauss,* 916 F.Supp. at 541. In *Strauss,* the defendant hospital[8] made a decision that it also characterized as a "business decision" to enter an exclusive contract and terminate the privileges of all radiation oncologists, including Strauss, unless they were able to contract with the new exclusive provider.[9] *See id.* at 535. The plaintiffs, two radiation oncologists who were unable to contract with the new exclusive provider, sued the hospital in federal district court alleging, *inter alia,* that the hospital had breached their contract rights when it denied them a hearing regarding the decision to terminate their privileges. *See id.* at 537. The hospital, like WCHA in this case, relied upon *O'Brien* for the proposition that it had no obligation to give the plaintiffs the hearing provided by the bylaws upon termination of the plaintiffs' privileges because the hearing was "required only when a physician's privileges are being restricted or revoked

---

8. In discussing the *Strauss* case, we will refer to the defendant therein, Peninsula Regional Medical Center, as the "hospital", even though elsewhere in this Opinion it is a defined term, meaning Washington County Hospital Association.

9. The hospital in *Strauss* originally intended to enter an exclusive contract with an outside provider, but later made special arrangements with some of the radiation oncologists to "grandfather" them, so that they could continue to practice at the hospital under the direction of the new Chief of Radiation Oncology and his group, which was the exclusive provider. *See Strauss,* 916 F.Supp. at 536.

due to specific allegations of professional incompetence or neglect which must be reported to federal and state regulatory agencies." *Id.* at 538. It asserted that the plaintiffs' privileges were terminated after the Board of Trustees made a "'reasonable management decision' to solve the problems in the Division of Radiation Oncology by bringing in new leadership and closing the medical staff of the Division." *Id.* The federal district court closely examined this Court's decision in *O'Brien* and concluded that *O'Brien* should not be interpreted in the broad fashion urged by the hospital. *See id.* at 540–41. It pointed out several distinguishing factors, including the fact that the plaintiffs' privileges in *O'Brien* were derived solely from their own exclusive contract with the hospital. *See id.* at 540.

The most important factor distinguishing *O'Brien,* according to the federal district court, was that in *O'Brien,* "'[n]o suggestion [was] made that the radiologists ... failed to conduct themselves properly while their contract with the [h]ospital was in effect. There [was] nothing to defend.'" *Id.* at 540–41 (quoting *O'Brien,* 49 Md.App. at 373, 432 A.2d 483). The district court found that although the hospital contended that the plaintiffs were terminated only because of a management decision, there were resolutions made by the Board of the defendant hospital indicating that "the termination of plaintiffs' medical staff privileges was based, in part, on allegations of dishonesty, concealment of material facts, and self-dealing" (as to Strauss only), as well as "repeated instances of disruptive physician behavior ... and an inability of [the radiation oncologists] to cooperate and work effectively with one another [as to both plaintiffs]." *Id.* at 541. Quoting from our decision in *O'Brien,* the *Strauss* Court held that the physicians whose privileges had been terminated were entitled to have a hearing because "a doctor faced with charges of this kind must be given a due process opportunity to defend himself." *Id.* (quoting *O'Brien,* 49 Md.App. at 371, 432 A.2d 483). The district court explicitly pointed out that a hearing was proper under *O'Brien* even when a hospital's decision to enter the exclusive contract had the dual purpose of 1) disci-

plining physicians for failing in their duties, and 2) making a business decision. *See id.* at 541 n. 17.

Like *Strauss*, this case also involves allegations that impinge upon the professional qualifications of the plaintiff. Volcjak, and the other physicians, were accused of several different offenses including: being careless with the handling of controlled substances, allowing CRNAs to perform patient care responsibilities that physicians ought to have performed themselves, failing to respond to reported clinical deficiencies, maintaining poor attitudes, and not being sufficiently available to provide needed services. While WCHA characterized its decision to enter an exclusive contract as a "business decision," the undisputed facts show that allegations of inadequate "quality of care" involving Volcjak and the other anesthesiologists made in the HCFA report were the primary or exclusive reason for such a decision. Contrary to WCHA's assertion that a hearing would serve no purpose because Volcjak's termination was merely a business decision, it is these allegations that frame the issues to be decided at the hearing.[10]

We do not consider significant the fact that the HCFA report referred to Volcjak only by his title as Chief of the Department of Anesthesiology. It is a fact of modern society that a professional reputation can be lost by being part of a group of professionals who are formally "condemned." The fact that the anesthesiologists at the WCHA were criticized as a group, and that as a result of that criticism their privileges were terminated, has grave repercussions for them in their subsequent professional lives.

---

**10.** WCHA cites four out-of-state cases to support its contention that the hearing provisions are not applicable when the hospital enters an exclusive contract with another provider. None of these cases involved allegations of professional misconduct against the physicians terminated. *See Dutta v. St. Francis Reg'l Med. Ctr., Inc.,* 254 Kan. 690, 867 P.2d 1057, 1059–63 (Kan.1994); *Bartley v. Eastern Me. Med. Ctr.,* 617 A.2d 1020, 1021 (Me.1992); *Holt v. Good Samaritan Hosp. and Health Ctr.,* 69 Ohio App.3d 439, 590 N.E.2d 1318, 1321 (Ohio Ct.App.1990); *Gonzalez v. San Jacinto Methodist Hosp.,* 880 S.W.2d 436, 437–40 (Tex.App.1994).

In this case, Volcjak alleges that the president of WCHA advised the newspapers of Washington County that, because of the statements in the HCFA report about the anesthesiologists, the hospital was in danger of losing its Medicare funding. The president further acknowledged in writing that the HCFA report had changed his mind about the quality of care provided by the anesthesiologists at WCHA. In his "Plan of Action," he said that "[m]ost everyone believes that the clinical quality provided by our Anesthesiologists is good, but *recent events bring that issue into serious question.*" (Emphasis added). We conclude that it was not necessary, as WCHA contends, that the hospital formally adopt the HCFA report, and re-allege the criticisms of the anesthesiologists in a formal disciplinary proceeding in order to invoke the hearing provisions of the Bylaws. The statements made by the hospital are tantamount to allegations against Volcjak of failing to live up to his professional obligations.

We have no doubt that the hospital, under its Corporate Bylaws and Medical Staff Bylaws had the right to make a business decision to enter an exclusive contract for anesthesiology services and not to reappoint Volcjak to the medical staff. *See O'Brien,* 49 Md.App. at 378, 432 A.2d 483. But the Bylaws provide Volcjak with due process through internal procedural protections as the hospital completes the decision-making process, and these protections were allegedly not followed by WCHA. Under the Bylaws, Volcjak was entitled to a hearing by a Committee of the Medical Staff at some point during the continuum of actions that comprised the adverse action. One occasion that the hearing could have been held was when the hospital, having decided to restructure the department of anesthesiology, sent a reappointment letter to Volcjak. This letter, for the first time, imposed a new restriction upon his privileges, by advising Volcjak that his reappointment and clinical privileges would be terminated unless he was selected as the exclusive provider.

Prior to that time, the Board had formally authorized the president to pursue two alternatives to solve the quality of care problems among the anesthesiologists that were outlined

in the HCFA report—entering an exclusive contract, or hiring a physician to be the chief of the department of anesthesiology. It would be highly material to both the president and Board, or its executive committee, in making decisions to carry out this resolution, to achieve a better understanding of the circumstances that led to the criticisms in the HCFA report. The report of a Hearing Committee, composed of five neutral physicians on the Medical Staff of WCHA, after hearing evidence upon the issues raised by the HCFA report, would certainly be highly relevant to the hospital's decisions made in the course of carrying out its resolutions and Plan of Action.

At the time of the September 29 letter, the hospital may or may not have finally decided upon the alternative of an exclusive provider. Clearly, they had not selected who would be the exclusive provider nor negotiated the contract for exclusive services. Volcjak, at a hearing, might be able to present evidence that: 1) the HCFA report was wrong, or exaggerated the problems in the department of anesthesiology; 2) the HCFA report was accurate in reporting problems generally in the department but he, personally, never was careless with controlled substances, did not allow non-physicians to perform responsibilities that should properly have been done by him, had a perfect attitude, was always available for service, etc.; or 3) he personally had done everything within his power to solve those problems caused by the other doctors, but did not have the necessary authority over the other doctors to improve their performance.

The results of the hearing could have influenced the president or Board in several ways. One, they may have decided that Volcjak was highly qualified as a physician, but could not perform the necessary leadership role. Thus, they may have decided not to proceed with an exclusive contract, but rather, select a new Chief of Anesthesiology, and give the Chief more power in order to improve overall operations in the anesthesiology department. Two, in negotiating the contract with Blue Ridge, the hospital may have required that Blue Ridge offer jobs to Volcjak and the other anesthesiologists, rather

than just "consider" them for employment. Three, they may have decided upon an arrangement similar to that selected by the hospital in the *Strauss* case, under which an "exclusive provider" was selected, but several of the existing providers were "grandfathered" and allowed to continue practicing at that hospital, subject to the direction of the new exclusive provider and chief of the department. *See Strauss,* 916 F.Supp. at 540.

A hearing could have a substantive impact upon the course of events for other reasons as well. The results of a hearing may have influenced Blue Ridge to proceed in the manner in which it treated Volcjak. The facts alleged in this case are suggestive that Blue Ridge did not want to hire Volcjak, and looked for a way to avoid interviewing or considering him. We do not know what information Blue Ridge possessed about Volcjak, but certainly the results of a hearing, during which time Volcjak would be given an opportunity to explain his side of the story, could have influenced Blue Ridge's thinking about his professional ability and performance. Blue Ridge had a contractual obligation with WCHA to interview and consider Volcjak for employment based on standards pertaining to quality of care. A report from the Hearing Committee regarding the issues raised in the HCFA report could certainly have been material to Blue Ridge in fulfilling its contractual obligation with the hospital to consider Volcjak for long term employment. Similarly, the hospital could have been influenced by the report in enforcing the contractual obligation of Blue Ridge to consider Volcjak for employment. If the WCHA Board had received a positive report from the Hearing Committee about Volcjak, the hospital would have been in a position to pressure Blue Ridge to offer employment to Volcjak instead of declining even to interview him.

The hearing guaranteed in the Bylaws served still another purpose. The termination of his privileges at WCHA could very well require that Volcjak make application to one or more hospitals for privileges. Such hospitals would likely require him to fill out applications similar to the application for privileges at WCHA. One question on the WCHA application

asks whether the physician has ever had privileges terminated at another hospital, and if so, to explain the circumstances.[11] Further, with newspaper coverage of the HCFA report, WCHA's response, and the usual professional networking, it is very likely that another hospital may have heard that WCHA risked losing its Medicare funding because of the poor quality of operations in the department of anesthesiology. If the Hearing Committee reported that Volcjak was blameless or only minimally at fault, then Volcjak would stand in a much better position to explain convincingly to a new hospital that he does not have a past record of poor performance, notwithstanding his loss of privileges at WCHA.

All of the circumstances outlined above contrast sharply with the situation in *O'Brien,* in which the only cause of the plaintiffs' loss of privileges was the failure to reach an agreement with AAGH as to the terms and conditions of a new exclusive contract. In *O'Brien,* there were no allegations relating to professional conduct for the plaintiff physicians to defend. In contrast to *O'Brien,* where there was no reason to hold a hearing, here, both the hospital and the plaintiff could benefit from one. In *O'Brien,* we carefully distinguished the situation presented in that case from one involving allegations of professional misconduct, and we said:

> It seems clear to us that [the hearing procedure] presupposes notification to the practitioner that he has failed in his duties to the Hospital, his patients, or in the competent practice of medicine. Obviously a doctor faced with charges of this kind must be given a due process opportunity to defend himself.

*O'Brien,* 49 Md.App. at 371, 432 A.2d 483. In light of the severe criticisms in the HCFA report, WCHA's public acknowledgment of the report as a threat to its Medicare

---

**11.** In *Strauss,* the court noted that when a hospital terminates privileges of a doctor, "future consequences could be very severe," in part because future applications for appointment to other hospitals will require information about all instances in which membership status or privileges have ever been denied, revoked, or not renewed. *Id.* at 541 n. 18.

funding, its characterization of the situation as one requiring swift and decisive action, and its subsequent termination of Volcjak's privileges, we cannot catagorize Volcjak's situation as comparable to the plaintiffs in *O'Brien*.[12]

In summary, the hospital took an adverse action with respect to Volcjak's privileges in the course of resolving the problems raised by the HCFA report. Volcjak timely requested a hearing, twice, after receipt of the letters announcing this adverse action. The hospital's denial of a hearing constituted a denial of the procedural protections contained in the Medical Staff Bylaws, which are part of Volcjak's contract with the hospital. *See id.* at 370, 432 A.2d 483. For these reasons, we conclude that the trial court erred when it granted WCHA's motion for summary judgment under Count I of Volcjak's Third Amended Complaint on the grounds that the Bylaws did not require a hearing.[13]

## II.

### Breach of Contract Against Blue Ridge

In Count V of his Third Amended Complaint, Volcjak asserts that Blue Ridge breached contractual rights held by

---

**12.** We do not need to reach the question of whether Volcjak would be entitled to a hearing in the absence of the HCFA report containing allegations of professional misconduct. We observe, however, that the rationale in *O'Brien* and in the out-of-state cases cited by the hospital suggest that there would be no reason for a hearing absent such allegations.

**13.** Volcjak also argues that the hospital breached its contract with Volcjak because hospital officers terminated his privileges without the explicit authority of the Board of Trustees. We reject Volcjak's contention because, even if the officers lacked authority, the hospital has ratified the officer's action by defending this litigation challenging the purportedly unauthorized act. *See Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 442, 518 A.2d 151 (1986) (holding that ratification may be inferred when the principal, through works, conduct, or silence, indicates its desire to affirm the unauthorized act); *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir.1994), *cert. denied*, 514 U.S. 1014, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995); Restatement (Second) of Agency § 97 (1958) (stating that defense of litigation challenging a claimed unauthorized act constitutes ratification).

him as a third party beneficiary of the contract between Blue Ridge and the hospital. Specifically, he asserts that Blue Ridge breached the clause in that contract that required Blue Ridge to "consider [the existing anesthesiologists at WCHA] for long term employment or contract" using specified criteria. Volcjak has alleged that Blue Ridge failed to fulfill this contractual obligation when it declined to interview him and failed to consider him for employment. Blue Ridge asserts that Volcjak has no standing to assert this alleged breach, and we agree.

■ Blue Ridge asserts that Volcjak cannot be a third party beneficiary to the contract between Blue Ridge and the hospital because neither party intended him to be a beneficiary. As Blue Ridge correctly points out, a third party qualifies as a third party beneficiary of a contract only if the contracting parties intend to confer standing to enforce the contract upon that party. *See Flaherty v. Weinberg,* 303 Md. 116, 125, 492 A.2d 618 (1985). It is not sufficient that the contract may operate to his benefit. *See Weems v. Nanticoke Homes, Inc.,* 37 Md.App. 544, 553, 378 A.2d 190 (1977).

■ Construction of a contract is generally a matter of law for the court. *See Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069 (1991). The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself. *See Little v. Union Trust Co.,* 45 Md.App. 178, 181, 412 A.2d 1251 (1980) (quoting *Shillman v. Hobstetter,* 249 Md. 678, 688, 241 A.2d 570 (1968)). The language prefacing the contractual undertaking by Blue Ridge relied upon by Volcjak recites that the hospital's purpose in requesting such a clause was "to reduce the possibility of suit by anesthesiologists" arising from the exclusive contract with Blue Ridge. In the contract, the hospital also indemnifies Blue Ridge against any claims filed by such anesthesiologists arising from the exclusive relationship between Blue Ridge and the hospital.

In this case, Volcjak claims third party beneficiary status as a creditor beneficiary. Proof of the intent to confer direct beneficiary status upon a third party requires evidence that the " 'intent stemmed from the promisee's status as a debtor of the third party. . . .' " *See id.* (quoting *Weems,* 37 Md.App. at 556, 378 A.2d 190). In *Weems,* this Court reviewed Maryland law on third party beneficiaries. It found that creditor beneficiary status will be found when "the accompanying circumstances and performance· of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary. . . ." *Weems,* 37 Md.App. at 552, 378 A.2d 190 (quoting Restatement of Contracts § 133(b) (1932)). It· also quoted an earlier Maryland decision, explaining that

'[i]n order to recover it is essential that the beneficiary shall be the real promisee; *i.e.,* that the promise shall be made to him in fact though not in form. *It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.'

*Id.* at 553–54, 378 A.2d 190 (quoting *Mackubin v. Curtiss–Wright Corp.,* 190 Md. 52, 57–58, 57 A.2d 318 (1948) (emphasis in original)).

Certainly the promise by Blue Ridge, if carried out, could have benefitted Volcjak. But if the parties did not intend to confer upon him standing to enforce that promise, then·he is only an incidental beneficiary. *See id.* Utilizing the *Restatement* standard mentioned above, we evaluate whether the hospital included the clause in the contract with an intent to satisfy an "actual or supposed or asserted duty" that the hospital owed to Volcjak and that could be discharged by Blue Ridge. *Id.* at 552, 378 A.2d 190. Taking these words literally, it could be said that the hospital required Blue Ridge to consider Volcjak because the hospital was concerned that it at least had an "asserted duty" to Volcjak. In other words, the hospital sought to protect itself from having Volcjak assert that the hospital had a duty to continue his privileges at WCHA. We do not think, however, that the mere prospect of litigation by a claimant is enough to qualify that claimant as a

third party beneficiary of a contract wherein one contracting party takes steps to minimize the possibility of such litigation. We see a distinct difference between a contract wherein one party intends to have the other party provide substitute performance of its perceived duty to a third person, and the situation here, where the hospital sought to acquire some "litigation protection" by minimizing the likelihood that the anesthesiologists would have reason to assert claims against it. We think it is clear from the contractual language that the hospital, in requesting Blue Ridge to give consideration to the existing anesthesiologists, was intending to gain protection for the hospital, not the anesthesiologists.

For these reasons, we conclude that Volcjak was not a third party beneficiary of the contract between Blue Ridge and the hospital. Accordingly, we affirm the decision of the trial court to grant summary judgment in favor of Blue Ridge on Count V of the Third Amended Complaint.

## III.

### Interference Claims

Volcjak next appeals from the trial court's decision that he failed to state a cause of action for the tort of interference with prospective economic relations or advantages against the hospital (in Count II) or against Blue Ridge (in Count III). He contends the hospital committed this tort when it breached his contractual right to have a hearing, with the intent of interfering with his business relations with patients at the hospital. He claims that Blue Ridge committed this tort by denying his application for a working "arrangement" with Blue Ridge, thereby interfering with his business relations with patients at the hospital. WCHA counters that even if it did breach its contract, it had no tortious intent and committed no improper or wrongful conduct. Blue Ridge, similarly, argues that it committed no wrongful or unlawful act, but rather, merely competed with Volcjak to obtain the exclusive contract for anesthesiology services at WCHA. Because the hospital had a contract with Volcjak, and Blue Ridge did not,

the analysis of Volcjak's claims of interference against each differs somewhat.

Before addressing each claim, we will review the elements of a cause of action for tortious interference with prospective business relations. These elements were first stated in Maryland in *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909), as follows:

'(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'

*Id.* at 355, 71 A. 962 (quoting *Walker v. Cronin,* 107 Mass. 555, 562 (1871)). We have continued to rely upon these elements, restating them earlier this year in *Lyon v. Campbell,* 120 Md.App. 412, 431, 707 A.2d 850, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998). In applying these elements of the tort, we have held that "[t]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim". *Id.* There must also be proof that the defendant's interference was accomplished through improper means. *See id.*

### Claim Against Hospital

The hospital, in defense of Volcjak's claim, focuses on the requirement of wrongful conduct, and correctly asserts that the types of wrongful acts that have established liability for this tort have been limited to " 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith[.]' " *K & K Management, Inc. v. Lee,* 316 Md. 137, 166, 557 A.2d 965 (1989) (quoting W. Prosser, *Handbook of The Law of Torts* § 130 at 952–53 (4th ed.1971) (footnotes omitted)). We have declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has an incidental effect on the

plaintiff's business relations with third parties. *Id.* at 162–63, 557 A.2d 965. Although Volcjak has alleged that WCHA willfully breached its contract with him for the purpose of causing him damage, this allegation is not sufficient to state a cause of action for interference because it does not describe the necessary wrongful act. We explain.

In *K & K Management,* the plaintiffs, operators of a restaurant, asserted that their landlord's breach of the lease between them constituted tortious interference with the plaintiffs' relationship with their customers. The Court of Appeals denied the claim, explaining that "[a]ny claim of tortious interference with [the plaintiffs'] business relations with those customers is indistinguishable from the breach of [the lease]...." *Id.* at 162, 557 A.2d 965. The Court held that because the only "unlawful" act alleged was a breach of contract, without the aggravating wrongful acts of violence, intimidation, defamation, fraud, or other tortious conduct, the plaintiffs had no claim for interference. *See id.* at 168–70, 557 A.2d 965. A similarly flawed complaint is presented in this case.

Volcjak has alleged no wrongful conduct by the hospital, other than the breach of its contract with him. He has not alleged that the breach was accompanied by violence, intimidation, defamation, fraud, or other tortious conduct. Volcjak has alleged only that the hospital's *motive* was unlawful, i.e., that it breached its contractual obligation under the Bylaws with the intent to interfere with his relations with future patients at the hospital. While in some limited instances, the motive in breaching a contract can itself form the basis for the tort of interference, *see id.* at 160, 557 A.2d 965, the Court of Appeals decision in *K & K Management* tells us that this case does not present such instance. In *K & K Management,* the plaintiffs' restaurant was located within the premises of a motel owned and operated by the defendant landlord. Plaintiffs alleged the defendant breached the lease for the mere purpose of interfering with the plaintiffs' relations with their restaurant customers. The Court rejected such claim as a matter of law, saying:

The [plaintiffs] cannot claim that the guests at the motel or the persons working in the neighborhood were their customers whom the [defendants] sought to appropriate by breaking the lease. The patronage of those classes of customers primarily depended on location, and the [plaintiffs'] rights to the location depended on the [lease]. Any claim of tortious interference with the [plaintiffs] business relations with those customers is indistinguishable from the breach of the [lease]. . . .

*Id.* at 162, 557 A.2d 965 (footnote omitted).

The facts of this case are analogous in that the business relationship between Volcjak and the patients who would cease to utilize his services because he did not have access to the WCHA facilities depended largely on location, i.e., the fact that Volcjak was available to provide services at WCHA. Volcjak has not alleged interference with his business relations with any particular patients or identifiable groups of patients who desire his services, but cannot obtain them because of his loss of privileges at WCHA. Moreover, the few instances in which tortious interference has been held to arise from acts that constituted a breach of contract with the plaintiff were confined to limited circumstances in which the defendant committed such breach so that the defendant could obtain the benefit of the relationship with the plaintiff's customers. *See id.; Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.*, 114 Md. 403, 80 A. 48 (1911); *Winternitz v. Summit Hills Joint Venture*, 73 Md.App. 16, 532 A.2d 1089 (1987), *cert. denied*, 312 Md. 127, 538 A.2d 778 (1988). There is no allegation made by Volcjak that the hospital sought to appropriate those patients so that the hospital could provide anesthesiology services to them. Rather, the allegation is simply that it entered into a contract with a different group of anesthesiologists, who would provide the services to the patients.

### Claim Against Blue Ridge

Volcjak's claim against Blue Ridge for tortious interference fails for similar reasons. Volcjak bases his claim

against Blue Ridge on the latter's alleged breach of a contractual obligation to consider Volcjak for employment. He claims that Blue Ridge committed such breach in order to interfere with his contractual relationship with WCHA under which he held clinical privileges, thus causing damage to his lawful business of providing anesthesia services to patients at WCHA. We have already explained, in Section II, that Volcjak did not have a contractual relationship with Blue Ridge. Without such relationship, there can be no breach. The actions of Blue Ridge alleged by Volcjak merely amount to competition with Volcjak to obtain the exclusive contract for anesthesiology services at WCHA. Maryland courts have long recognized that taking competitive action to benefit one's own business interests, even at the expense of others, is not, in itself, tortious. *See, e.g., Alexander & Alexander, Inc. v. B. Dixon Evander, & Assoc., Inc.,* 336 Md. 635, 654, 650 A.2d 260 (1994).

For the reasons stated above, we hold that no cause of action for tortious interference against the hospital or Blue Ridge has been stated, and the trial court was correct in granting WCHA's motion for summary judgment as to Counts II and III of the Third Amended Complaint.

## CONCLUSION

In summary, Volcjak has alleged a cause of action for breach of contract against the hospital for its failure to grant him a hearing as required by the Medical Bylaws in the course of terminating his clinical privileges at the hospital. Therefore, we reverse the trial court's granting of summary judgment on Count I of the Third Amended Complaint, and remand for further proceedings. Volcjak had no contractual relationship with Blue Ridge, and therefore we affirm the trial court's granting of summary judgment in favor of Blue Ridge under Count V. Volcjak has failed to allege a cause of action for tortious interference against either the hospital or Blue Ridge, and therefore we affirm the trial court's granting of summary judgment in favor of defendants under Counts II and III.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR WASHINGTON COUNTY FOR FURTHER PROCEEDINGS AS TO COUNT ONE OF THE THIRD AMENDED COMPLAINT; COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE, THE WASHINGTON COUNTY HOSPITAL ASSOCIATION.